**UNITED STATES of America, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**No. 88 CIV. 4486 (DNE).**

United States District Court,
S.D. New York.

Nov. 2, 1989.

See also 723 F.Supp. 203.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., Randy M. Mastro, New York City, and Richard Mark, Asst. U.S. Attys., of counsel, for U.S.

Frederick B. Lacey and Stuart Alderoty, Newark, N.J., for Independent Admr.

Lipsitz, Green, Fahringer, Roll, Schuller & James, William M. Feigenbaum, Paul J. Cambria, Buffalo, N.Y., Gerald Chapman, of counsel, for Harold Friedman.

Law Offices of Moses Krislov Co., Moses Krislov, Cleveland, Ohio, for Anthony Hughes.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge:

This opinion arises out of the implementation of the voluntary settlement effected March 14, 1989, ("the Consent Decree") in the suit instituted by the plaintiffs, United States of America ("the Government"), against the defendants, International Brotherhood of Teamsters ("the IBT"), and numerous named officers of that union. The Consent Decree called for the appointment of three Officials, the Independent

Administrator, the Election Officer, and the Investigations Officer ("the Court Officers"), who would oversee the IBT's 1991 election for International Officers and file charges against those IBT members accused of corruption.

This particular controversy involves Application III of the Independent Administrator, where he asked this Court to rule on specific objections to his jurisdiction raised by Harold Friedman and Anthony Hughes, the first two IBT members to be prosecuted by the Investigations Officer under the strictures of the Consent Decree. The Independent Administrator dismissed Friedman and Hughes' objections in an opinion dated September 29, 1989 (the "Administrator's Opinion").

Application III was originally considered at a hearing held October 13, 1989 (the "main hearing"). On October 12, 1989, Friedman and Hughes jointly and separately moved to this Court pursuant to Rule 65, seeking injunctive relief barring the Independent Administrator from hearing these charges. Their injunction asks this Court to enjoin the Independent Administrator from conducting the hearing, or in the alternative, order that they not be collaterally estopped from contesting the substance of their charges, which allege the same conduct that formed the basis for their criminal convictions in *U.S. v. Friedman*, 86 Cr. 114, in the Northern District of Ohio.

Since Application III involved issues which, if decided, would influence the merits of Friedman and Hughes' injunction, a further hearing was held on October 16, 1989 (the "injunction hearing"). On October 18, 1989, this Court issued an order interpreting the portions of the Consent Decree contested at the main hearing (the "Interpretation Opinion"). This Court also issued an order asking the parties to the injunction hearing to submit further memoranda.

This opinion will decide Application III by the Independent Administrator, and all matters relating to the injunction motion by Friedman and Hughes. First, this opinion will consider the substance of Application III by the Independent Administrator, and then will rule on the injunctions. As an additional matter, while Friedman and Hughes submitted virtually identical motions, Hughes has argued that since he neither signed the Consent Decree nor was a party to the original suit, he should not be bound by the Consent Decree's changes to the IBT Constitution.

## I. Application III

The Independent Administrator submitted Application III pursuant to ¶ 12(I) of the Consent Decree. Summarily, Application III arises from the challenges of Messrs. Friedman and Hughes to the authority of the Independent Administrator to hear charges against them brought by the Investigations Officer under Article XIX, § 3(d); Article XIX, § 6(a) of the IBT Constitution; and paragraph D.5 of the Consent Decree. The Independent Administrator dismissed their jurisdictional objections in the Administrator's Opinion. The Independent Administrator then filed Application III to have this Court establish his authority to hear charges against these two IBT members, the first members to be brought up on charges filed pursuant to the enforcement scheme set up by the Consent Decree.

Friedman and Hughes' claims may be summarized as threefold: First, that Article XIX, Section 3(d) of the IBT Constitution, ("§ 3(d)"), precludes bringing charges against elective officers for actions "prior to their current elective term which were not then known generally by the membership." Friedman and Hughes claim their racketeering actions were known generally as a result of their indictments. Second, they claim that under Article XIX, Section 6(a) of the IBT Constitution, ("§ 6(a)"), as modified by ¶ D.6 of the Consent Decree, they cannot be disciplined while their criminal appeals pend before the Sixth Circuit. Third, they claim that under Article XIX, Section 6(a) of the IBT Constitution, as modified by ¶ D.5 of the Consent Decree, the statute of limitations has run out for the Independent Administrator to hear these charges.

The Investigations Officer charges Mr. Friedman and Mr. Hughes with violating the IBT Constitution by embezzling from Union funds and committing racketeering violations in violation of 18 U.S.C. §§ 1962(c) and 1962(d). The conduct occurred from 1978 through 1981. This conduct formed the basis for their convictions in *U.S. v. Friedman*, 86 Cr. 114 in the Northern District of Ohio.

## A. Charges "Known Generally"

■ Friedman and Hughes contest the authority of the Independent Administrator to hear charges against them stemming from their criminal convictions, since § 3(d) of the IBT Constitution bars disciplining elective officers for activities occurring prior to their current term which "were not known generally" by the membership.[1] Friedman and Hughes argue that since their convictions were the result of highly publicized trials, the charges must have been "known generally" to the membership. Both Friedman and Hughes were re-elected to posts after the indictment upon which they were convicted was filed.[2]

The Investigations Officer claims that § 3(d) refers to "activities and actions" generally known, not allegations. By this view, since Friedman and Hughes had only been indicted at the time of their re-elections, and since they denied the charges, their actual activities were not known generally to the membership. The Independent Administrator adopted the view of the Investigations Officer and dismissed Friedman and Hughes' contentions that, by virtue of the indictment and convictions against them, their actions were "known generally" to the IBT membership.

The Independent Administrator found that the racketeering activity of Friedman and Hughes could not have been "known generally" to the IBT membership. Further, the Independent Administrator reasoned that since Friedman and Hughes vigorously contested and continue to deny the criminal charges, then their actions could not have been generally known.[3]

I concur with the conclusion of the Independent Administrator in the Administrator's Opinion that charges against Friedman and Hughes are not barred by § 3(d). In the Investigations Officer's view, which the Administrator's Opinion adopts, § 3(d) precludes bringing disciplinary actions for *activity* generally known, not *allegations*. To this day Friedman and Hughes vehemently deny their guilt and maintain innocence despite their convictions. Such actions indicate that their actions could not have been "known generally" at the time of their convictions.

## B. Stays of Proceedings

■ Friedman and Hughes claim that § 6(a) prevents the Independent Administrator from pursuing charges against IBT members while they appeal their criminal convictions. § 6(a) prevents IBT officers from facing IBT disciplinary charges on the same facts while their judicial trials or appeals pend.[4] Further, Friedman and Hughes argue that the intent of § 6(a)—to prevent IBT members from unjust dismissals based on unsubstantiated civil or criminal allegations—should preclude these

---

1. The pertinent text of § 3(d) provides:
   Charges against elective officers of the International Union or any subordinate body shall be limited only to those activities or actions occurring during their current term, and *only those activities and actions occurring prior to their current term which were not known generally* by the membership of the International Union or the subordinate body in the case of an officer of a subordinate body. [Emphasis added.]
   IBT Const., Art. XIX, § 3(d) (as adopted by the 23rd International Convention, 1986).

2. The Administrator's Opinion indicated that Friedman was re-elected as President of Teamster Local 507 in 1987. Hughes was re-elected to his current term as recording Secretary of Teamster Local 507 in later 1987. Administrator's Opinion at 3.

3. *See* Administrator's Opinion at 3–5.

4. § 6(a) provides in relevant part:
   No member or officer shall be required to stand trial on charges involving the same set of facts as to which he is facing criminal or civil trial until his final court appeal has been concluded.
   IBT Constitution, Article XIX, Section 6(a) (As adopted by the 23rd Annual Convention, 1986).

charges since they still deny their convictions and the Court stayed their sentences pending appeal.

The Independent Administrator found that the relevant portion of § 6(a) was superceded by ¶ D.6 of the Consent Decree, which specifically allows the IBT President or Board to suspend an officer while he awaits the final outcome of a trial.[5] The Independent Administrator went on to find that ¶ F.12.A of the Consent Decree empowers the Independent Administrator with the same disciplinary power as the President or Executive Board.[6]

Friedman and Hughes' contention that § 6(a) precludes the Independent Administrator from hearing charges against them while their appeals pend is without merit and must be dismissed. I find that § 6(a) has been specifically superceded by ¶ D.6 of the Consent Decree, despite Friedman and Hughes' illogical assertions to the contrary. Both the specific language of ¶ D.6, and the spirit and intent of the Consent Decree as described in the Interpretation Opinion support the position of the Administrator's Opinion.[7]

Further, I am unpersuaded by Friedman and Hughes' view of the intent of the amended § 6(a). It is unreasonable to conclude that the spirit and intent of the Consent Decree—which specifically alters the IBT Constitution—should in any way preclude the Investigations Officer from pursuing charges against convicted felons. Throughout this matter, Friedman and Hughes seem to confuse being *accused* of criminal acts with being *convicted* of criminal conduct: Despite their protestations of innocence, both are convicted felons regardless of the fact they have pending appeals. That their sentences were stayed and that they continue to deny their culpability does not entitle them to the presumption of innocence they seek.

## C. Statutes of Limitations

■ Friedman and Hughes argue that the ¶ D.5 of the Consent Decree's modification of § 6(a) time bars the Investigations Officer from filing these charges. Friedman and Hughes point out that the original § 6(a) provided that all charges should be filed within one year of the alleged misconduct.[8] Further, ¶ D.5 of the Consent Decree—which modifies § 6(a) to provide for a five year statute of limitations—exempted the Court Officers from this revised statute of limitation.[9] They extrapolate that the Court Officers must then be bound by the background original one year statute of limitations for their actions.

The Independent Administrator found that the Consent Decree itself, coupled with its intent and spirit, indicated that the Court Officers were to be bound by *no* statute of limitations. The Administrator's Opinion went on the find that the Consent Decree, taken as a whole, vests the Court Officers with "no less power" than the IBT General President.[10]

I find that the plain language of ¶ D.5, taken together with the spirit and intent of the Consent Decree as a whole, support Independent Administrator's conclusion that the Court Officers are bound by no statute of limitations. The Consent Decree intended for the Court Officers to have no

---

**5.** ¶ D.6 of the Consent Decree amended § 6(a) as follows:
   Nothing herein shall preclude the General President and/or General Executive Board from suspending a member or officer facing criminal or civil trial while the charges are pending.
   Consent Decree at 5.

**6.** *See* Administrator's Opinion at 5–8.

**7.** *See* conclusion, Interpretation Opinion.

**8.** The pertinent portion of § 6(a) provides:
   Any charge based upon alleged misconduct which occurred more than one (1) year prior to the filing of such charge is barred and shall be rejected by the Secretary–Treasurer, except charges based upon the non-payment of dues, assessment and other financial obligations.

**9.** The pertinent part of ¶ D.5 provides:
   ... Section 6(a) of Article XIX ... shall be and is hereby amended to provide for a five (5) year period, running from the discovery of the conduct giving rise to the charge. This limitation period shall not apply to any actions taken by the Investigations Officer or the Administrator.

**10.** *See* Administrator's Opinion, at 7–8.

less disciplinary power than the General President. To deduce a background one year statute of limitations would eviscerate the spirit and intent of that portion of the Consent Decree. I find that Friedman and Hughes' analysis of the applicable statute of limitations for the Court Officers is flawed and must be rejected.

### D. Collateral Estoppel

■ The Independent Administrator determined that Friedman and Hughes should be collaterally estopped from contesting the substance of the charges against them at their hearings, since the charges are essentially the same as those previously decided in their criminal trials. Naturally, Friedman and Hughes argue that they should not be barred from re-litigating the charges against them. The Administrator's Opinion sets forth the standards for invoking "offensive" collateral estoppel, which prevents a losing party from re-litigating the same issues previously adversely decided in a separate action brought by a different plaintiff.

The Independent Administrator applied the well-settled standards for the use of offensive collateral estoppel set forth in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–332, 99 S.Ct. 645, 650–652, 58 L.Ed.2d 552 (1979). *See also* 1B Moore's Federal Practice ¶¶ 0.441[3]–[4].[11] The gist of Friedman and Hughes' argument is that invoking collateral estoppel would contravene the fourth element of the test, that its employment be unfair to them. They ask this Court to exercise the broad discretion over collateral estoppel given trial courts by *Parklane,* and find that offensive collateral estoppel would be unfair in this instance.[12]

I find that the Independent Administrator has correctly applied the doctrine of collateral estoppel. The Administrator's Opinion convincingly applies the listed standards to Friedman and Hughes, and I endorse those findings.[13] Friedman and Hughes' further use of their familiar argument—that it would be unfair to bind them to factual determinations made at their criminal trial whose result they actively disputed and are still appealing—again is unfounded and without merit.

I endorse and affirm the findings and rulings of the Administrator's Opinion in full. Friedman and Hughes' objections to the Administrator's Opinion are hereby denied.

My rulings on the issues raised in Application III establish the jurisdiction of the Independent Administrator to hear charges against Friedman and Hughes. While the issues decided to this point establish the ability of the Independent Administrator to hold these hearings, Friedman and Hughes have also moved this Court and seek an injunction barring the hearings.

### II. The Injunctions

Friedman and Hughes have moved this Court jointly and separately for an injunction to prevent the Independent Administrator from hearing the charges against them.

The standard for issuing a preliminary injunction in this circuit is a showing of (a)

---

**11.** The Administrator's Opinion summarized the criteria for invoking collateral estoppel as follows:
1. the party to be estopped must have been a party or in privity with the party to the prior action;
2. the issues to be estopped must be the same as the issues determined in the prior action;
3. the issues must have been actually litigated and necessary to the prior judgement;
4. application of collateral estoppel will not be unfair because:
   (a) The party to be estopped had little incentive to vigorously litigate the first action;
   (b) the first judgement is inconsistent with other judgments on the issue to be estopped;
   (c) the second action affords procedural opportunities unavailable in the first action (that the party had a full and fair opportunity to litigate the first action); or
   (d) application of collateral estoppel would not otherwise be unfair to the defendant.
   Administrator's opinion at 8–9.

**12.** *See Parklane, supra,* at 331, 99 S.Ct. at 651. The Supreme Court stated "that the preferable approach for dealing with these problems ... [is] to grant trial courts broad discretion to determine when it should be applied." *Id.*

**13.** *See* Administrator's Opinion at 8–9.

irreparable harm *and* (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly towards the plaintiff requesting the preliminary injunctive relief. *Kaplan v. Board of Education* 759 F.2d 256, 259 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

A. Separate Consideration of Hughes

■ While Friedman and Hughes move this Court for separate injunctions, each of their petitions incorporates the arguments of the other, and the merits of their motions should be considered together. Hughes—at both the main hearing and the injunction hearing, and in his further papers—argues that he, unlike Friedman, is not bound by the changes in the IBT Constitution wrought as a result of the Consent Decree, since he was neither a signator of the Consent Decree nor a party to the original lawsuit. Hughes further claims that under *Martin v. Wilks,* —— U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), non-parties to a consent decree cannot be bound to its effects.

Hughes' injunction motion should be considered on the same plane as that of a signator—in this instance Friedman—since his reliance on *Wilks* mischaracterizes both that situation and the one at hand. In *Wilks*, a class action suit by black firefighters in Birmingham, Alabama, resulted in a desegregation and affirmative action consent decree (the "Birmingham consent decree") which intended to integrate the Birmingham Fire Department. A group of white firefighters, who were not parties, intervenors, *amici*, or in any way involved in the original suit, subsequently challenged the Birmingham consent decree in a civil rights suit under Title VII. The District Court dismissed the later challenge as an impermissible collateral attack on promotion decisions made pursuant to the Bir-

mingham consent decree. A divided Supreme Court upheld the Eleventh Circuit's reversal of the District Court's dismissal, holding that a group which was in no way a party or intervenor to a litigation cannot be barred from litigating those issues in a later suit.

The factors underpinning the *Wilks* decision may be distinguished from the situation in the current IBT litigation. First, Hughes had his interests represented in this Consent Decree by the IBT defendants. The original complaint which ultimately resulted in the Consent Decree named the "International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO"—in other words, the IBT's international organization and headquarters (the "International IBT")—and the General Executive Board of the IBT as defendants. The International IBT is the leadership, and designated representative sitting atop the IBT hierarchy. The General Executive Board includes the highest elected officials of the whole IBT.

The International IBT, as the elective and administrative leadership of the IBT membership, litigated the suit and entered into the Consent Decree as the representative of its membership and considered the Consent Decree consonant with its member's interests.[14] In fact, the only logical purpose for the existence of the International IBT is to represent and protect its constituent members, including representing the IBT rank and file as a whole in lawsuits.

The defendant International IBT intended to represent the entire membership, both in the original litigation, and later in the implementation of the Consent Decree. In this situation, the IBT membership as a whole, and Hughes' interests in particular, were taken account of by the International IBT in negotiating the Consent Decree. Contrast this situation to *Wilks*, where the

---

**14.** As an example, the IBT leadership has contested the expenditures of the Court Officers—costs to be borne by the IBT—in carrying out the Consent Decree. The IBT justifies its intense oversight as fulfilling its duty to protect its member's money. Scores of IBT members have written the Court protesting the disbursement of IBT money for expenses they consider wasteful, and applaud their leadership's crusade to protect their financial interests.

later group collaterally attacking the Birmingham consent decree was completely absent from the original litigation and their interests unrepresented.

The second way this IBT case may be distinguished is that *Wilks* involved civil rights litigation, and the nature of the relief in the Birmingham consent decree—changes in the promotion structure of a public agency based on race which affected civil rights—is fundamentally different from the IBT situation. This Consent Decree entails appointing Court Officers to oversee the IBT electoral process leading up to (and including) the 1991 election, and to bring charges against IBT members guilty of racketeering acts. The ultimate aim of the Consent Decree is to guarantee free elections, and to rid the IBT of the hideous influence of organized crime. These goals seem squarely in the interest of the IBT rank and file as a whole.

Indeed, the Consent Decree appears to contravene the interests of only two classes of IBT members; the election oversight may imperil unfairly elected officers, and the prosecution scheme may ultimately suspend corrupt union members. Hughes, by virtue of his criminal conviction, falls in the latter category. To argue that it is unfair to bind Hughes—or any other IBT member falling in one of these two threatened classes—to the scheme created by the Consent Decree's changes to the IBT Constitution is simply ludicrous.

B. Irreparable Harm

■ Friedman and Hughes fail to demonstrate that they may suffer irreparable harm, and since they cannot meet the first prong of the Second Circuit's test, their motions for injunctions are denied. To be irreparably injured in this context, Friedman and Hughes must demonstrate that they stand to suffer a loss not compensable monetarily. *Weinberger v. Romero Barcelo*, 456 U.S. 305, 312–13, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982); *Jackson Dairy, Inc. v. H.P. Hood, supra*, at 72. Further, loss of wages by an identifiable group of employees does not qualify as irreparable harm in the Second Circuit. *Intern. Bro. of Teamsters v. Pan Am World Airways*, 607 F.Supp. 609, 614 (E.D.N.Y. 1985); *Local 553 Transport Workers v. Eastern Air Lines*, 695 F.2d 668, 678 (2d Cir.1982).

If the Administrator were to rule against Friedman and Hughes, they stand to lose their IBT wages, endure injuries to their reputation, and, they claim, suffer from facing an improper trial. This opinion has already ruled that the Independent Administrator has jurisdiction to hold the hearings. Since identifiable lost wages do not constitute irreparable harm in the Second Circuit, the only possible irreparable harm to Friedman and Hughes would be damage to their reputations as a result of removal from the IBT. Since Friedman and Hughes are both convicted felons, potential suspensions should cause little further damage to their reputations.

Even if possible lost wages and potential harm to reputation could constitute irreparable harm, the movants still have not yet suffered any actual irreparable harm. Friedman and Hughes are threatened with potential suspension from the IBT as a result of the Administrator's hearing. At this point, however, the Independent Administrator has not disciplined Friedman or Hughes. Further, even if the Independent Administrator should rule against them on all the charges, Friedman and Hughes still have recourse to appeal to this Court under ¶ 12(A) of the Consent Decree.

IBT members suspended under the Consent Decree's disciplinary apparatus may seek review by this Court under ¶ 12(A) of the Consent Decree. Because of this review procedure, no IBT member with a similar hearing pending faces irreparable harm. The Consent Decree plainly anticipated the very circumstances Friedman and Hughes now seek to escape, and the ¶ 12(A) review process is an adequate safeguard against error or unfairness. Given such procedural protections, a pending hearing before the Independent Administrator does not constitute irreparable harm to Friedman, Hughes, or any future IBT member similarly situated.

Accordingly, Friedman and Hughes' motions for preliminary injunctions are hereby denied, and the Independent Administrator may proceed with the hearings in question.

SO ORDERED.