UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION VII BY the INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

March 13, 1990.

Frederick B. Lacey, Independent Adm'r, Newark, N.J.

Charles M. Carberry, Investigations Officer, New York City, and Robert W. Gaffey, of counsel.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y. (Paul J. Cambria, Jr., William M. Feigenbaum, Richard P. Weisbeck, Jr., of counsel), for Harold Friedman.

Law Offices of Moses Krislov, Co., Moses Krislov, Cleveland Ohio, for Anthony Hughes.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), for U.S.

James T. Grady, Gen. Counsel, Intern. Broth. of Teamsters, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City (Jed S. Rakoff, Walter P. Laughlin, Robert P. Knapp III, Vincent Esposito, Jr., of counsel) for Intern. Broth. of Teamsters.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiffs United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials; the Independent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

On January 11, 1989, the Independent Administrator submitted Application VII to this Court. Through the vehicle of this Application, the Independent Administrator presents for this Court's review his decision dated January 11, 1990 (the "January 11, 1990 Decision of the Independent Administrator") on the long-pending charges against two IBT officials, Harold Friedman and Anthony Hughes ("Friedman and Hughes"). Paragraph F.12.(A)(e) of the Consent Decree permits a party to a disciplinary hearing fourteen days to seek the review of this Court. Through Application VII, the Independent Administrator sought review of his January 11, 1990 decision in order to expedite the process. Friedman and Hughes did not object to appealing the

decision in this manner, and in their replies cross-moved this Court for a preliminary injunction.

## I. Background

This Application culminates the long series of confrontations between Friedman and Hughes, and the Court Officers and the Government over their disciplinary hearings. Friedman and Hughes, the first two IBT officials charged, tried, and now found guilty under the remedial scheme created by the Consent Decree, have vehemently and actively fought these charges. While this Court will review the background leading up to Application VII with varying detail, this Court is familiar with Friedman and Hughes' histories up to this point. For the purposes of completing the record, attention should also be directed to the September 29, 1989 decision of the Independent Administrator, the November 2, 1989 Memorandum and Order of this Court deciding Application III, 725 F.Supp. 162 (S.D.N.Y.1989) (the "November 2, 1989 Opinion"), and the November 29, 1989 Order of this Court denying reconsideration of Application III.

### A. The Defendants

Harold Friedman was a named defendant in the original RICO lawsuit filed on June 28, 1988 and a signatory to the Consent Decree. At that time, Friedman was a member of the GEB, being the Eleventh Vice–President of the IBT. In addition, Friedman was President of Local 507 located in Cleveland, Ohio, and President of the Ohio Conference of Teamsters. In the intervening time, Friedman has since left the GEB, but continues to serve as President of Local 507 and the Ohio Conference of Teamsters. Friedman was re-elected to his current post as President of Local 507 in 1987.

Anthony Hughes is currently the Recording Secretary of Local 507 in Cleveland. He was neither a party to the original RICO suit, nor a signatory to the Consent Decree. Hughes was re-elected to his current post of Recording Secretary of Local 507 in 1987.

Friedman, Hughes, and the late Jackie Presser were co-defendants in a criminal indictment in the Northern District of Ohio eventually tried as *United States v. Friedman, et al.*, 86 Cr. 114 (White, J.). The charges involved allegations that the defendants embezzled from certain unions through a "ghost employee" scheme. Friedman and Hughes were convicted of the charges in that indictment and sentenced by Judge White to a four-year term of probation, and separation from all IBT-related activity for a concurrent four-year period. Judge White stayed the imposition of the sentence pending the outcome of Friedman and Hughes' appeals of their convictions to the United States Court of Appeals for the Sixth Circuit.

### B. The Charges

The Investigations Officer filed charges against Friedman and Hughes on July 26, 1989, comprising the group of allegations termed "Charge I" by the Independent Administrator. Charge I alleged in substance that the conduct which formed the basis of their criminal convictions on racketeering charges also violated specific provisions of the IBT Constitution. From the beginning, Friedman and Hughes emphatically denied these charges, as well as the underlying convictions. The Independent Administrator held hearings on Charge I on December 13, 1989, and January 4, 1990. On September 20, 1989, the Investigations Officer filed additional charges against Friedman alone, alleging that he breached the IBT Constitution by associating with known organized crime figures, which the Independent Administrator has termed "Charge II." No hearing has yet been held on Charge II.

Charge I specifically alleged that Friedman violated the IBT Constitution by:

1. Violating Article II, Section 2(a) of the International Brotherhood of Teamsters Constitution by conducting yourself in a manner to bring reproach upon the International Brotherhood of Teamsters, to wit: by embezzling funds from Bakery, Confectionery and Tobacco Workers International Union, Local

19, in 1981. This conduct was the basis for your conviction for embezzling union funds in violation of 29 U.S.C. § 439 in the United States District Court for the Northern District of Ohio, 86 Cr. 114.

2. Violating Article II, Section 2(a) of the International Brotherhood of Teamsters Constitution, by conducting yourself in a manner to bring reproach upon the International Brotherhood of Teamsters, to wit: by conspiring to and conducting the affairs of an enterprise through a pattern of racketeering from 1978 through 1981 in violation of 18 U.S.C. §§ 1962(c) and (d). This conduct formed the basis for your conviction on Counts I and II of the Indictment, 86 Cr. 114, in the Northern District of Ohio.

3. Violating Article II, Section 2(a) of the International Brotherhood of Teamsters Constitution, by conducting yourself in a manner to bring reproach upon the International Brotherhood of Teamsters, to wit: by filing a false form LM–2 with the Department of labor for the Bakery, Confectionery and Tobacco Workers International Union, Local 19, in 1982. This criminal conviction formed the basis for your conviction on Count IV of the Indictment, 86 Cr. 114, in the United States District Court for the Northern District of Ohio.

Hughes was charged with the following:

1. Violating Article II, Section 2(a) of the International Brotherhood of Teamsters Constitution, by conducting yourself in a manner to bring reproach upon the International Brotherhood of Teamsters, to wit: by embezzling funds from Bakery, Confectionery and Tobacco Workers International Union, Local 19, in 1981. This conduct was the basis for your conviction for embezzling union funds in violation of 29 U.S.C. § 439 in the United States District Court for the Northern District of Ohio, 86 Cr. 114.

2. Violating Article II, Section 2(a) of the International Brotherhood of Teamsters Constitution, by conducting your-self in a manner to bring reproach upon the International Brotherhood of Teamsters, to wit: by conspiring to and conducting the affairs of an enterprise through a pattern of racketeering from 1978 through 1981 in violation of 18 U.S.C. §§ 1962(c) and (d). This conduct formed the basis for your conviction on Counts I and II of the Indictment, 86 Cr. 114, in the Northern District of Ohio.

The allegations filed by the Investigations Officer treat Friedman and Hughes' criminal convictions as the underlying conduct which forms the basis of their violations of Article II, section 2(a) ("§ 2(a)") of the IBT Constitution. Section 2(a), the IBT oath of office, enumerates obligations incumbent upon all members. In relevant part, § 2(a) requires that members "conduct himself or herself at all times in such a manner as not to bring reproach upon the Union ..." What behavior violates this prohibition has become the subject of considerable disagreement.

### C. Pre–hearing Litigation Involving Friedman and Hughes

Events involving Friedman and Hughes first came before this Court through Application III by the Independent Administrator, submitted October 3, 1989. In Application III, the Independent Administrator sought review of the September 29, 1989 Decision, in which he established his jurisdiction to hear the charges filed against Friedman and Hughes. In response to Application III, Friedman and Hughes jointly and separately moved this Court for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, which asked this Court to rule the Independent Administrator had no jurisdiction to hear the charges.

Specifically, Application III presented the question of the jurisdiction of the Independent Administrator to hear charges against them, in light of the provisions at Article XIX, § 3(d) and Article XIX, § 6(a) of the IBT Constitution; and ¶ D.5 of the Consent Decree. The September 29, 1989 Decision found (1) that although § 3(d) protected

IBT Officers from discipline for conduct prior to their current elective term that was "known generally" to the membership, it did not shield Friedman and Hughes from these charges; (2) that § 6(a), as amended by ¶ D.6 of the Consent Decree, specifically permitted charges while appeals of underlying criminal convictions pend; (3) that ¶ D.5 of the Consent Decree modified another portion of § 6(a) and lengthened the statute of limitations for charges from the incumbent one-year to a five-year period from the alleged misconduct, and permitted this hearing; and (4) that Friedman and Hughes were collaterally estopped from relitigating the substance of their criminal convictions in *U.S. v. Friedman*, 86 Cr. 114 (N.D.Oh.).

The injunction by Friedman and Hughes essentially sought consideration of the issues adversely decided by the September 29, 1989 Decision (and already before the Court by way of Application III). Hughes alone argued that since unlike Friedman he was neither a party to the original lawsuit nor a signatory of the Consent Decree, he should not be bound by its strictures or changes to the IBT Constitution.

The substance of Application III and the injunction in opposition were among the issues considered at a hearing held October 13, 1989. Since Application III involved issues which, if decided, would influence the merits of Friedman and Hughes' injunction, a further hearing to specifically consider these issues was held on October 16, 1989.[1]

The November 2, 1989 Opinion affirmed the Independent Administrator's September 29, 1989 Decision in all respects, in particular establishing his jurisdiction to hold hearings on the disciplinary charges against Friedman and Hughes. This Court denied the injunctions for lack of irreparable harm, since they ultimately could seek review of any decision by the Independent Administrator in this Court. Finally, this Court found that Hughes was bound by the strictures of the Consent Decree.

Friedman and Hughes both appealed the November 2, 1989 Opinion to the United States Court of Appeals for the Second Circuit. The Second Circuit preserved Friedman and Hughes' rights to appellate review of the decisions, but refused to stay the ruling of this Court, effectively allowing the hearings before the Independent Administrator to go forward.

In addition to Friedman and Hughes' direct litigation before this Court, Local 507 filed suit in the Northern District of Ohio alleging that the Independent Administrator, the Investigations Officer, and the IBT with breaches of the IBT Constitution resulting from the implementation of the Consent Decree. Friedman also brought a motion for a temporary restraining order against the hearing before his pending an interpretation of the stay issued in his criminal conviction. This Court subsequently enjoined both Cleveland actions, and the Government alleged that Friedman was in contempt of the permanent injunction located at ¶ E.10 of the Consent Decree against obstructing with its implementation. The events surrounding the suits are more fully discussed in the January 17, 1989 Opinion and Order of this Court (the "January 17, 1990 Opinion").

In connection with the actions in Cleveland, the Government also prosecuted separate contempt charges against Friedman. After a series of hearings on alleged contumacious conduct by Friedman, the collateral suits in Cleveland were withdrawn. After further factual submissions, the question of Friedman's contempt is still under active consideration by this Court, and will be considered later in this Opinion.

## II. Standards for Review

 The instant opinion marks the first time this Court will act in its appellate capacity over the rulings of the Independent Administrator in a disciplinary matter. As a preliminary matter this Court must establish a standard of review for determinations of the Independent Administrator,

---

1. On October 18, 1989, this Court issued a Memorandum and Order, 723 F.Supp. 203 (S.D.N.Y. 1989) which ruled, among other things, that

Friedman, Hughes, and the Government should submit further memoranda relating to this subject.

since the Consent Decree is silent on this matter. Paragraph F.12(A)(e) of the Consent Decree does provide that the Independent Administrator should use the "just cause" standard at hearings.

The statutory standard of review by district courts of decisions by the National Labor Relations Board (the "N.L.R.B.") in the labor context, is the "abuse of discretion" standard outlined in the Administrative Procedure Act. *See* 5 U.S.C. § 706. *See also Universal Camera Corporation v. NLRB,* 340 U.S. 474, 486–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *N.L.R.B. v. Gordon,* 792 F.2d 29, 32 (2d Cir.1986). Under the abuse of discretion standard, District Courts should overturn findings only if unsupported by "substantial evidence." *See* Feerick, Baer, Arfa, N.L.R.B. Representative Elections § 7.9.1. *See also Universal Camera Corporation v. N.L. R.B., supra,* 340 U.S. at 486–88, 71 S.Ct. at 463–65.

This Court believes that the interests of fairness and justice favors the abuse of discretion standard, which requires this Court to thoroughly scrutinize the decisions of the Independent Administrator.

*III. The November 1, 1989 Resolution*

■ The IBT held a special meeting of the GEB on November 1, 1989 where they discussed and passed a resolution which (1) interpreted Article II, § 2(a) and limited violative conduct to those offenses specifically enumerated at Article XIX, § 6(b)(3)–(6) thereby eliminating those at § 6(b)(1)–(2), and (2) interpreted Article XIX, § 3(d) to shield re-elected officials from facing disciplinary charges simply if the membership knew of the allegations, regardless of whether the officials denied the conduct or not (collectively, the "November 1, 1989 Resolution"). These reinterpretations were accompanied by an explanatory legal memorandum from the IBT in support.

The November 1, 1989 Resolution would effectively preclude the charges against both Friedman and Hughes through its reinterpretation of § 3(d), since both were re-elected to their union posts in 1987, after their 1986 indictments. Charge I specifically alleges violations of § 2(a) still cognizable even after the November 1, 1989 Resolution.

Indeed, the November 1, 1989 Resolution would eviscerate almost all other pending charges filed by the Investigations Officer that allege violations of § 2(a) stemming from associating with known organized crime figures, as well. The reinterpretation of § 2(a) was purportedly undertaken at the behest of GEB member Theodore Cozza—who himself currently faces charges for violating § 2(a) by associating with known organized crime figures.[2] For reasons to be discussed, the Independent Administrator chose to disregard the November 1, 1989 Resolution.

Both the IBT and the Independent Administrator seek to protect important rights critical to the success of the remedial reforms without infringing upon IBT's protected sphere. But the effect of the November 1, 1989 Resolution—to invalidate and void pending charges against IBT officers, including members of the GEB—must raise questions over its propriety.

Upon review of the circumstances surrounding the November 1, 1989 Resolution, the provisions in the Consent Decree, and the deference courts grant unions to interpret their constitutions, this Court finds the entire November 1, 1989 Resolution unreasonable and to be disregarded by the Independent Administrator.

A. The Independent Administrator's Determination that He is Not Bound by the November 1, 1989 Resolution

In his January 11, 1990 Decision, the Independent Administrator considered the November 1, 1989 Resolution in light of his enumerated obligations and powers under the Consent Decree, the jurisdiction of the IBT to interpret its constitution, and the circumstances surrounding its passage. The Independent Administrator concluded

---

**2.** In addition to the charges filed by the Investigations Officer, Cozza, a signatory to the Consent Decree, has filed a collateral suit in this Court seeking to litigate issues relating to his charges.

that he was not bound by the November 1, 1989 Resolution and disregarded it with relation to Friedman and Hughes.

Specifically, the Independent Administrator found that paragraph F.12.(A) of the Consent Decree vested him with the same disciplinary power as the IBT General President or GEB, as enumerated in Articles VI and XIX of the IBT Constitution. The Independent Administrator referenced Article VI, Section 2(a) as empowering the General President to interpret the constitution regarding disciplinary matters, and Article IX, Section 1 as authorizing the GEB to interpret and apply the IBT Constitution. In addition, ¶ F.12.(A) authorized the Independent Administrator to affirm, modify, or reject disciplinary decisions made by the General President or GEB. Taken together, the Independent Administrator deduced the authority both to void a constitutional interpretation by the General President or General Executive Board if it involved disciplinary matters, and to make his own interpretations of the IBT Constitution on disciplinary matters. *See* January 11, 1989 Decision at 15–35.

The Independent Administrator ruled the November 1, 1989 Resolution unreasonable in light of the circumstances surrounding its passage, its inconsistency with the IBT Constitution itself, and its effect on pending charges. In addition, he found such an exculpatory attempt violated the spirit and intent of the injunction against associating with organized crime figures located at ¶ E.10 of the Consent Decree.

In their submissions on this particular subject, the IBT outlined the motives and justifications of the GEB in passing the November 1, 1989 Resolution. They indicated that the GEB felt that the language of § 2(a) was too vague, and did not adequately inform IBT officers what conduct would subject them to disciplinary charges under that section. With respect to the reinterpretation of § 3(d), the IBT iterated that the distinction between conduct alleged and actual conduct—the interpretation proffered by the Independent Administrator in his September 29 Decision and affirmed by this Court in the November 2, 1989 Opinion—should be eliminated as transgressing the policy underlying the

original passage of § 3(d). The IBT indicated that the original purpose of § 3(d) was not to upset election results and thereby contravene the common weal of an IBT local, as demonstrated through the ballot box.

Beyond providing justifications for their actions, the IBT challenged the legal basis of the Independent Administrator to ignore this resolution. Specifically, the IBT argued (1) that the Consent Decree in no way permitted the Independent Administrator to (a) interpret the IBT Constitution, or (b) override a lawfully rendered interpretation; (2) the attempt of the Independent Administrator to disregard the November 1, 1989 Resolution violated the plain language of the Consent Decree; and (3) the November 1, 1989 Resolution was reasonable and lawful and must be honored.

Friedman and Hughes argued the more general proposition that the November 1, 1989 Resolution was on its face a reasonable exercise of power by a legitimately empowered body. They further contended that the Independent Administrator had no power to preempt a legitimate exercise of IBT prerogative.

The Investigations Officer fully supported the Independent Administrator's conclusion that he was not bound by the November 1, 1989 Resolution. The Investigations Officer further offered six rationales for this Court to affirm the Independent Administrator's determination; (1) that the Independent Administrator was not bound by the interpretations proffered by a co-equal body (the GEB); (2) the GEB sought to exculpate Friedman, Hughes, [and perhaps Cozza]; (3) the resolution contradicted the plain language of the IBT Constitution; (4) the resolution was passed in bad faith; (5) the resolution was inconsistent with prior GEB determinations; and (6) the resolution violated the Consent Decree.

B. The Relative Authority of the Independent Administrator, the General President, and the GEB Under the IBT Constitution and the Consent Decree

The IBT Constitution empowers the General President, and GEB to interpret the

IBT Constitution. Article VI, Section 2(a) of the IBT Constitution empowers the General President to unilaterally interpret the constitution between meetings of the GEB. Article IX, Section 1 grants the GEB the authority to interpret the constitution between International Conventions of the IBT.

The Consent Decree created the Independent Administrator as a surrogate under the IBT Constitution for the General President and the GEB for the purposes of disciplinary matters. Paragraph F.12.(A) specifically vested the Independent Administrator with authority over all disciplinary matters equal to that of the GEB and the General President. As determined in the January 17, 1990 Opinion, "IBT General Counsel Grady averred that the provisions of the Consent Decree were not merely a settlement between the individual signatories and the International IBT alone, and the Government, but that the Consent Decree is 'the Constitution of the International Brotherhood of Teamsters.'" January 17 Opinion at 53 (*quoting* Testimony of James T. Grady, [General Counsel of the IBT], before the United States Senate, *Federal Government Use of Trusteeship under the RICO Statute: Hearings Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate* 101st Cong., 1st Sess. 31 [April 4, 1989] ). The power of the Independent Administrator to act over disciplinary matters has roots not only in the Consent Decree but in the IBT Constitution itself.

In this instance, the Court is faced with a serious conflict over the implications of two separate provisions of the Consent Decree, those in ¶ F.12.(A), and also paragraph M.18 ("¶ M.18"). Paragraph M.18 specifically stated that the settlement did not affect any provisions in the IBT Constitution other than those listed in the order. The IBT believes that ¶ M.18 prevents the delegation of interpretive power, either to

courts or court-appointed officers. As always, Consent Decrees must be interpreted according to their explicit terms. *See United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Securities and Exchange Commission v. Levine*, 881 F.2d 1165, 1178–79 (2d Cir.1989).

### 1. The Background Power of the IBT to Interpret Its Constitution

It is true that as a general rule Courts recognize the power of labor unions to interpret their own Constitutions, and defer to their interpretations unless they are not fair or reasonable. *Felton v. Ullman*, 629 F.Supp. 251, 255 (S.D.N.Y.1986); *Association of Contracting Plumbers of NYC v. Local no. 2*, 676 F.Supp. 523, 529 (S.D.N.Y. 1988); *District Council 37 v. Wurf*, 496 F.Supp. 1021, 1026 (S.D.N.Y.1980); *Local 334, etc. v. United Association of Journeymen*, 669 F.2d 129, 131 (3d Cir.1982), *quoting Stelling v. Intern. Broth. of Elec. Workers*, 587 F.2d 1379 (9th Cir.1978), *cert. denied* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979); *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir.1971).[3] Courts should be reluctant to unduly interfere in union administration. *Association of Contracting Plumbers v. Local no. 2, supra*, 676 F.Supp. at 529; *Felton v. Ullman, supra*, 629 F.Supp. at 529; *District Council 37 v. Wurf, supra*, 496 F.Supp. at 1025–26. Courts must be careful not to freely substitute their judgment for that of more skilled union officials in interpreting their own constitutions. *Felton v. Ullman, supra*, 629 F.Supp. at 255; *District Council 37 v. Wurf, supra*, 496 F.Supp. at 1026.

Precedent urging judicial deference to a union's own interpretations of its constitution has only limited relevance in this instance. While the IBT has the power to interpret its Constitution, that power is itself rooted in that document. The Independent Administrator's disciplinary powers

---

**3.** The IBT noted that the Fifth Circuit will not invalidate a union's interpretations of its own constitution unless they are "patently unreasonable." *Newell v. Intern. Broth. of Elec. Workers,* 789 F.2d 1186, 1189 (5th cir.1986), *quoting Stell-* *ing v. Intern. Broth. of Elec. Workers, supra,* 587 F.2d at 1389. The *Stelling* Court itself only required a "reasonable" standard, and this reading is at odds with this Court's reading of *Stelling.*

derive from the Consent Decree and the IBT Constitution itself.

The IBT argued that it is error for the Independent Administrator to vest himself with power to interpret the IBT Constitution, since such power is non-delegable and should never be exercised by the Courts, or by extension Court–Appointed officers. But *Vestal, supra,* and *Association of Contracting Plumbers, supra,* the authority cited by the IBT, make no such blanket statement of non-delegability, and instead view union constitutional omnipotence as a conditional power.

While the IBT argues that ¶ M.18 preserves their right to interpret their Constitution as they see fit, unfettered power may allow them to frustrate the implementation of the Consent Decree through "interpretations"—as done here. In order to prevent reforms from being carried out or protect members from charges, the IBT could interpret existing provisions or even amend their Constitution to accomplish such malignant aims. Such actions must be scrutinized carefully to determine their reasonableness.

### 2. The Reasonableness of the November 1, 1989 Resolution

At the outset, paragraph L.17 of the Consent Decree ("¶ L.17") specifically bound the IBT to its provisions, "constitutional or otherwise." Consent Decree at 25. Paragraph L.17 was intended to protect the background understanding by both parties of what existing rules, regulations, and Constitutional provisions would govern the IBT. Paragraph L.17 indicated that the Government assumed a baseline level of disciplinary authority for the Independent Administrator, and required the IBT to notify the Government of any changes that alter the spirit, intent, or letter of the Consent Decree or the provisions implicated by it. Should the Government object, the IBT would need to seek approval of this Court.

The November 1, 1989 Resolution may be a direct violation of ¶ L.17. Such significant alterations in the offenses which constitute violations of the IBT Constitution are major changes in the governing rules of the IBT, and certainly contravene the spirit and intent of the Consent Decree. On this ground alone, the November 1, 1989 Resolution could be voided.

Since the IBT may have been confused as to its obligations under ¶ L.17, this Court will consider the reasonableness of the November 1, 1989 Resolution on its merits. Upon consideration of the substance of the resolution, the circumstances surrounding its passage, and the provisions of the Consent Decree, the Independent Administrator correctly ruled that the November 1, 1989 Resolution was unreasonable.

The Independent Administrator and Investigations Officer argue that the November 1, 1989 Resolution is unreasonable and contrary to law. Further, they argue that it contravenes both the Consent Decree and its good faith obligations. The IBT responds that the Resolution represents a lawful, reasonable, and rational action by the IBT.

A review of their cited authority belies the IBT's view that charges based on the term "reproach" could not withstand scrutiny. They argued that "catch-all" provisions such as § 2(a) would be void for vagueness and therefore the GEB was legally required to clarify it. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), and *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), are completely inapposite, since they consider public laws, not the provisions of labor union. The IBT fails to cite persuasive authority in the labor union context, since *Mallick v. International Brotherhood of Electrical Workers,* 644 F.2d 228, 236 (3d Cir.1981), and *Semancik v. United Mine Workers of America,* 466 F.2d 144 (3d Cir. 1972) both involved restrictions on speech, rights specifically guaranteed under the Labor Management Reporting and Disclosure Act (the "LMRDA"), 29 U.S.C. § 411, and different from those implicated in this instance.

Indeed, Courts may invalidate a union's interpretation of its constitutional provisions if it finds them motivated by self protectionism and therefore unreasonable. *Papianni v. International Association of Bridge, Structural and Ornamental Iron Workers*, 622 F.Supp. 1559, 1565, 1569–70 (D.N.J.1985); *Morrissey v. Curran*, 423 F.2d 393, 398–99 (2d Cir.1970). A review of the facts and circumstances of the November 1, 1989 Resolution demonstrates that this action of the GEB was unreasonable.

The resolution was passed at a special meeting of the GEB held on November 1, 1989. That meeting was held without notice to the Independent Administrator, and the IBT provided no agenda in advance as required by the Consent Decree. Despite the critical impact of the reinterpretations on the implementation of the Consent Decree—effects fully outlined previously—the IBT failed to notify the Independent Administrator of the meeting. *See* November 29, 1989 Order of this Court. The behavior of the IBT regarding the November 1, 1989 meeting itself is the subject of a dispute—over whether the discussions held at that meeting are protected from disclosure to the Independent Administrator by the attorney-client privilege—and currently under consideration by this Court.

The GEB responded to "requests" by Theodore Cozza to provide an interpretation of § 2(a) and specifically enumerate the offenses which would qualify as bringing "reproach" upon the IBT. Further, the GEB considered § 3(d), the provision used to uphold charges against former GEB member Harold Friedman, as to the IBT's view of what constitutes "known generally," and whether an officer must be convicted or his actions merely publicized before the membership may be said to have "known generally" of the behavior. The IBT supported its resolutions with a legal opinion justifying the changes.

The IBT sees no moment in the important fact that the reinterpretations as proffered exculpate current or former GEB members from facing charges, and instead focused on detailing specific prohibited conduct to members. Such actions cannot withstand judicial scrutiny as "reasonable," and the Independent Administrator correctly found them as such. *See* January 11, 1989 Decision at 19.

The reinterpretation of § 2(a) in particular may contravene the permanent injunction against associating with members of organized crime located at ¶ E.10 of the Consent Decree. While the GEB indicated in its November 1, 1989 interpretive memo that the reinterpretation of § 2(a) in no way condoned associating with organized crime figures, it defies logic to then determine that a specific allegation of such association would not "bring reproach upon the union."

Finally, the submissions indicate that in 1988, the GEB itself treated the catchall provision at § 2(a) as reasonable in its prosecution of former GEB member Schurr, a fact at odds with the IBT's own memorandum issued as part of the November 1, 1989 Resolution. Schurr was convicted in *United States v. Schurr*, 84 Cr. 43 (E.D. Pa.), *aff'd* 775 F.2d 549 (3d Cir.1985), *aff'd on rehearing*, 794 F.2d 903 (3d Cir.1986), and the GEB prosecuted him for violations of § 2(a). At that time, the GEB, General President McCarthy, (and General Counsel Grady) were comfortable with the prior interpretation. The GEB made no indication that the charges against Schurr were too vague.

### 3. Remedies Under the Specificity Requirement of Section 101 of the LMRDA

The IBT issued the November 1, 1989 Resolution ostensibly sought to specifically inform members what conduct is prohibited by the IBT Constitution.[4] Despite the fact that officers could seek relief by challenging the charges before the Independent Administrator to ensure their compliance with LMRDA specificity requirements, the GEB instead interpreted the constitutional

---

**4.** Charge I as filed against Friedman and Hughes by the Investigations Officer withstands scrutiny and meets the specificity requirements of federal law. Neither Friedman nor Hughes contested Charge I on these grounds.

foundations of these charges out of existence. The second portion of the November 1, 1989 Resolution does not directly implicate the LMRDA.

The November 1, 1989 Resolution is not necessary to satisfy the IBT's concerns that its officers not be charged with vagaries. Under this remedial scheme, the proper course of action for a charged officer would be to petition the Independent Administrator for an order of particularized charges. Should they not find relief from the Independent Administrator and subsequently be found guilty of charges they deem vague, they may challenge such convictions before this Court.

Indeed, the November 1, 1989 Resolution's reinterpretation of § 2(a) itself is not required under Federal law, since a general " 'catch-all' charge for activities which are not expressly proscribed in [a union's] constitution" are legal so long "as it is not implemented in an abusive or malicious manner." *Gordon v. Winpisinger*, 581 F.Supp. 234, 240 (E.D.N.Y.1984) (McLaughlin, J.).

It is revealing that the specific charges filed by the Investigations Officer which gave rise to the reinterpretation of § 2(a) alleged that IBT officers knowingly associating with known organized crime figures—the specific conduct which prompted the underlying RICO lawsuit. Indeed, the overt purpose of the Consent Decree itself is to eliminate the taint of organized crime from the IBT. Such conduct implicates no rights protected by the LMRDA or any other federal law.

*IV. The Substantive Decision of the Independent Administrator*

 With the preliminary matters decided, this Court may now turn to the most critical task at hand, that of reviewing the portion of the January 11, 1990 Decision of the Independent Administrator which determined the fate of Friedman and Hughes. The charges as filed against Friedman and Hughes primarily accuse them of violating the IBT Constitution's bar against bringing reproach upon the union located at § 2(a). The Investigations Officer framed these charges so that the conduct which formed the basis of their criminal convictions ostensibly constitutes the basis of their violations of § 2(a). In short, the claim is that Friedman and Hughes' convictions (1) established a pattern of racketeering activity, (2) determined embezzlement, and (3) proved they falsified LM–2 forms.

Given the previously established standard, their substantive objections must be evaluated in the following context: Did the Independent Administrator abuse his discretion in finding there was just cause to determine that Friedman and Hughes were guilty of the charges and should be suspended.

The Independent Administrator dichotomized his analysis into two parts: Friedman and Hughes' liability for the charged acts, and the penalties to be imposed. In addition, to the January 11, 1990 Decision, the Independent Administrator issued a Supplemental Decision on February 6, 1990 (the "February 6, 1990 Supplement") to consider letters written on behalf of Friedman and Hughes in mitigation of punishment. Upon review of the earlier rulings of this Court and a searching examination of the record, the January 11, 1990 Decision, and the February 6, 1990 Supplement, the Independent Administrator had just cause to find Friedman and Hughes guilty of the charges.

Because of the previous rulings of both the Independent Administrator and this Court, Friedman and Hughes were collaterally estopped from relitigating the substance of their criminal convictions. As a result, their major strategy at the hearing was to argue the affirmative defense of § 3(d) that the membership of Local 507 "knew generally" that Friedman and Hughes actually had done that conduct alleged in the Indictment.

**A. § 3(d) Does Not Shield Friedman and Hughes**

At the outset, this Court has already twice established that Article XIX, § 3(d) of the IBT Constitution—which provides that an IBT elected official may not be disciplined for "activities or actions" not

known generally to the membership—does not bar these charges. First, in the November 2, 1989 Opinion, this Court specifically considered the exact issue and then determined that § 3(d) refers to actual known actions, and since Friedman and Hughes vehemently denied the charges in their criminal indictment, then the membership could not have "known generally" about their actions. November 2, 1989 Opinion, 725 F.Supp. 162, 165.

Second, in an earlier section of this Opinion reviewing the November 1, 1989 reinterpretation of § 2(a) and § 3(d), this Court again decided to reject an interpretation of § 3(d) which eliminates the distinction between "allegations" and "activities and actions." Simply stated, this Court believes the Independent Administrator's determination that only those officials elected with the full public knowledge of confirmed actions and activities—such as by a criminal conviction—would shield an IBT officer from charges under § 3(d). This interpretation, as iterated earlier, is taken in effectuating the spirit and intent of the Consent Decree. This Court interprets the actions of the Independent Administrator and the GEB with this background interest in mind.

The relevant interpretation of § 3(d) means that Friedman and Hughes would have to prove that the membership of Local 507 had conclusive knowledge that the defendants were actually guilty of the conduct when they were reelected. Any other interpretation would only require that any charged IBT officer deny the conduct to avail himself of the § 3(d) affirmative defense. Consistent with past rulings, this Court believes that the expansive view of § 3(d) accurately distinguishes between "allegations" and "activities."

In the February 6, 1990 Supplement, the Independent Administrator indicated that Friedman and Hughes introduced 1,483 letters from members of Local 507 in Cleveland, Ohio ostensibly as proof that the membership of that local knew generally of Friedman and Hughes' wrongdoing. The Independent Administrator read the letters and determined that only 18 indicated any knowledge of Friedman and Hughes' actual

conduct, and even those were inconclusive. The Independent Administrator then determined that since the letters were not specific, written after the criminal trial, and only 18 indicated knowledge of the conduct, that the letters did not mean that the membership "knew generally" of the conduct.

Based upon the Independent Administrator's thorough review, he did not abuse his discretion in determining that there was just cause to not allow the affirmative defense of § 3(d).

### B. Friedman and Hughes' Objections to the Liability Determination

■ In his appeal of the Independent Administrator's decision, Friedman further reiterated that the Independent Administrator incorrectly applied the doctrine of collateral estoppel, since Anthony Hughes—who opted not to testify at their criminal trial—would now testify that this ghost employee scheme was undertaken at the direction of the FBI. According to Friedman, only the FBI, the late Jackie Presser, Hughes, and he knew of the FBI's authorization for their actions, yet none of them testified. Since the Independent Administrator erred in refusing to allow Hughes' testimony at his hearing, Friedman reasoned, the findings should be overturned.

This Court agrees with the ruling of the Independent Administrator that Friedman had ample opportunity to raise whatever defenses he could in his criminal trial. The Independent Administrator correctly applied the doctrine of collateral estoppel. *See* November 2, 1989 Opinion 725 F.Supp. at 167. It is well settled that a criminal defendant has the greatest incentive to fully and comprehensively defend himself against criminal charges. And Friedman has proved himself to be a most voracious litigant. In this instance Friedman faced charges alleging the exact same conduct as that proved in his criminal trial. The procedural guarantees in place at his criminal trial exceeded those possible in a hearing by the Independent Administrator. This Court finds that the Independent Administrator did not abuse his discretion in apply-

ing collateral estoppel on the issue of their underlying conduct.

### D. Friedman and Hughes' Objections to the Penalty Determination

█ The Independent Administrator determined that Friedman and Hughes should each be suspended from all IBT related activity and draw no money from the Union for a period of one year. While he applied collateral estoppel to the factual aspects of the underlying Charge I, the Independent Administrator heard testimony from Friedman and Hughes regarding alleged FBI authorization for the ghost employee scheme in mitigation of punishment. The Independent Administrator weighed the evidence, and the credibility of the witnesses, and determined that Friedman had no prior knowledge of any FBI involvement. He then concluded that these assertions should not mitigate Friedman's culpability or punishment. The Independent Administrator had just cause for such a finding.

In the February 6, 1990 Supplement, the Independent Administrator considered the 1,483 letters written in support of Friedman and Hughes in mitigation of the penalty to be imposed. Friedman and Hughes have objected to the penalty imposed by the Independent Administrator to the extent that it may be inconsistent with their appeal of their criminal convictions.

The Court of Appeals for the Sixth Circuit, they argue, will review their petitions and either affirm or overturn their criminal convictions, which call for a four year probation and suspension from IBT-related activity. Friedman and Hughes contend that if the Sixth Circuit affirms their convictions, then the penalty imposed by the Independent Administrator is moot. On the other hand, should the Sixth Circuit reverse their convictions, then the conduct which formed the basis of the charges would no longer be proven.

This contention by Friedman and Hughes does have considerable merit, but at the present time it is premature for this Court to make a final determination, since the Sixth Circuit may act in any number of ways in between outright affirmance and reversal. As a result, this Court will lift the voluntary stay on the penalty imposed by the Independent Administrator so that the suspension becomes effective immediately. Further, Friedman and Hughes are hereby granted leave to petition this Court for a modification of the penalty if warranted by the decision of the Sixth Circuit. The forthcoming ruling from the Sixth Circuit does not leave moot the charges in Charge II against Friedman.

### V. Contempt Proceedings Initiated Against Harold Friedman

As discussed earlier, the Government sought contempt sanctions against Friedman in connection with the lawsuits filed by Local 507 in Cleveland. Two hearings were held on the contempt allegations. As a result of those proceedings, the suit filed by Local 507 was withdrawn. Further, the motion before Judge White was withdrawn. Since Friedman caused the withdrawal of both suits, ostensibly initiated a the behest of the GEB of Local 507, Friedman purged himself of all contempt. Therefore, the remaining issues involved in the contempt charges became moot. As a result, no decision will be rendered and the matter considered fully settled.

### VI. Conclusion

The January 11, 1990 Decision of the Independent Administrator is hereby affirmed with respect to the finding of liability. Friedman and Hughes' cross-motions for injunctions are hereby denied, and are granted leave to seek further review of this Court consistent with this Opinion. The Independent Administrator may hear Charge II against Friedman. Further, paragraph F.12.(A), paragraph M.18, and paragraph L.17 of the Consent Decree are hereby interpreted in accordance with the above rulings. The contempt charges against Harold Friedman are hereby determined to be dismissed.