**UNITED STATES of America, Plaintiff,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.**

**In re Petition for REVIEW OF DECISION 91–ELEC. APP.–106 OF THE INDEPENDENT ADMINISTRATOR.**

**No. 88 CIV. 4486 (DNE).**

United States District Court,
S.D. New York.

May 13, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), New York City, for the U.S.

Frederick B. Lacey, Independent Administrator of the International Broth. of Teamsters, New York City (Stuart Alderoty, Newark, N.J., of counsel), Michael Holland, Election Officer of the Intern. Broth. of Teamsters, New York City (Barbara Hillman, Chicago, Ill., of counsel), Cohen, Weiss & Simon, New York City (Susan Davis, of counsel), for Committee to Elect Ron Carey.

Gibson, Dunn & Crutcher (Robert Sacks, Steven Tallent, William Highberger, New York City, Pillsbury, Madison & Sutro, Robert A. Gordon, Christopher L. Byers, San Francisco, Cal., of counsel), for Western Conference of Teamsters Pension Fund and Joseph A. Ballew.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge:

This decision arises from the implementation of the rules for the International Brotherhood of Teamsters ("IBT") International Union Delegate and Officer Election promulgated by the Election Officer (the "election rules") and approved by this Court by Opinion & Order dated July 10, 1990, 742 F.Supp. 94 (S.D.N.Y.1990), and the Court of Appeals *United States v. International Brotherhood of Teamsters*, 931 F.2d 177 (2d Cir.1991). These election rules provide a "framework for the first fully democratic, secret ballot election in the history" of the IBT. July 10, 1990 Opinion, *supra*, 742 F.Supp. at 97.

Petitioners Western Conference of Teamsters Pension Trust Fund (the "Trust") and Joseph Ballew, an employee of the Western Conference of Teamsters and Co-chairman of the Trust appeal decision 91–Elec. App.–106 of the Independent Administrator, which affirmed as modified the Election Officer's decision P–291A–LU278–CSF pursuant to Article X, § 1(a)(8) of the election rules. The Election Officer and Independent Administrator determined that Ballew had violated Article X, § 1.b.(1) of the election rules in connection with the preparation and distribution, at Trust expense, of written materials about Ron Carey, an accredited candidate for IBT General President. Petitioners seek to overturn the findings of the Independent Administrator. This petition was ripe for this Court's review on April 25, 1991. Petitioners twice moved this Court to stay the decision of the Independent Administrator. This Court denied the first application on April 11, 1991, and the second on May 10, 1991.

The decision of the Independent Administrator is affirmed.

### I. Background and Procedural History

The Trust is affiliated with the Western Conference of Teamsters ("WCT"), a subordinate entity of the IBT. The Trust is a multi-employer pension plan established pursuant to § 302(c) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c), and a pension plan as defined in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A). The Trust has 14 employee trustees, including Ballew, two other employees of the WCT, with the remaining employee trustees being officers or officials of the WCT. Four of the 14 employee trustees, Arnie Weinmeister, Chuck Mack, Ben Leal, and Michael Riley, are announced candidates for International Office on the "Durham–Mathis Unity Team" slate. (Decision of Independent Administrator [Dec.In.Ad.] at 2).

Ron Carey is the president of IBT local 804 in Long Island City, New York, and a Trustee of the Local 804 IBT/Local 447 IAM United Parcel Employees Pension Plan (the "Local 804 plan"). A notable feature of the Local 804 plan is the "30 and out" feature, where participants may begin receiving full benefits after 30 years of service, rather than benefits being tied to reaching a certain age. Carey negotiated the Local 804 plan. Carey is an accredited candidate for IBT General President. (Dec.In.Ad. at 3).

The following facts were found by the Election Officer and affirmed by the Independent Administrator. On January 23, 1990, Ballew wrote to Mr. Richard Pirnke, an independent trust administrator, asking Pirnke to review and comment on the Local 804 plan. In that letter, Ballew wrote "Since this plan will be the one that our WCT plan will be compared to, I am sending this to you for your review and comments." (Dec.In.Ad. at 3). That inquiry was not made for the purpose of any pending collective bargaining negotiations, or at the request of any participant in, or beneficiary of the Trust. That inquiry was found to be in response to Carey's campaign and candidacy. (Dec.In.Ad. at 4–5).

On March 19, 1990, Pirnke responded, adversely comparing the local 804 plan to the Trust (the "Pirnke letter"). That comparison noted in particular the demographic differences between the WCT and Local 804 memberships that made the "30 and out" feature less attractive to Trust participants. (Dec.In.Ad. at 5).

In November, 1990, Jack R. Bookter, Secretary–Treasurer of Local 278 in San Francisco, California (affiliated with the WCT), sent Ballew a videotape of a campaign presentation by Carey. In that videotape, Carey makes specific reference to the Trust, and the Local 804 plan's "30 and out" feature. (Dec.In.Ad. at 6–7).

On November 28, 1990, Ballew wrote back to Bookter, on Trust stationery, in his capacity as co-chairman/secretary of the Trust (the "Ballew letter"). In that letter, Ballew made unfounded and pejorative remarks about Carey, stating that Carey took unfounded liberties in describing the Local 804 plan. The Ballew letter went on to set out the "limitations of significance" in the Local 804 plan, and then emphasized positive features of the Trust. (Dec.In.Ad. at 6–7).

The Election Officer and Independent Administrator found that Ballew did not circulate the information in the Pirnke letter or use that information for collective bargaining purposes until he was contacted by Bookter. (Dec.In.Ad. at 6–7).

Ballew then sent copies of his letter to all other employee trustees of the Trust. No employer trustee received a copy. Bookter distributed copies of the Ballew letter to members of his local who inquired about the Carey presentation at local 278 expense. Chuck Mack, a member of the WCT policy committee, distributed the Ballew letter to all members of his Local 70, at IBT expense. (Dec.In.Ad. at 6–7).

After considering the facts as found by the Election Officer and Independent Administrator, the Independent Administrator concluded the following:

> [I]t is readily apparent that Ballew's November 28, 1990 letter was designed to refute Carey's campaign statements regarding pensions and the Local Union 804 plan. In short, the Ballew letter is intended to influence the election of Carey as General President. Stated more plainly, the Ballew letter constitutes anti-Carey campaign literature. Given the fact that the Trust is prohibited from making any campaign contribution, its

distribution of the November 28, 1990 letter violates the Election Rules.

(Dec.In.Ad. at 8).

The Election Officer ordered the Trust and Ballew to take curative steps (the "curative steps"). These steps were affirmed as modified by the Independent Administrator. Those steps are as follows:

1. The Trust is prohibited from making any further contributions of value, including distribution of the Ballew letter where the purpose, object, or foreseeable effect of that contribution is to influence the election of a candidate for delegate, alternate delegate or International Officer of the IBT.

2. Ballew is to reimburse the Trust for the cost and expense of the preparation and disbursement of the Ballew letter.

3. Ballew is to bear the expense and distribute copies of a notice to be sent to all persons to whom he had sent his letter advising the recipients of the subject Election Rules violation and a disclaimer by the Trust of the Ballew letter.

(Dec.In.Ad. at 13–16). The Trust and Ballew appeal the findings of the Independent Administrator to this Court.

## II. Discussion

With respect to the electoral provisions of the Consent Decree, the Court of Appeals and this Court have now determined that the Investigations Officer and Independent Administrator are stand-ins for the General President and GEB, who properly delegated their power to those Court Officers pursuant to Article XXVI, § 2 of the IBT Constitution. *United States v. International Brotherhood of Teamsters, supra*, 931 F.2d 177 *aff'g* July 10, 1990 Opinion & Order, 742 F.Supp. 94; May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D. N.Y.1991); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1048–57, *aff'd* 907 F.2d 277 (2d Cir.1990);

This Court and the Court of Appeals have interpreted ¶ K.16 to mean that decisions of the Independent Administrator "are entitled to great deference." 905 F.2d 610, 616 (2d Cir.1990) *aff'g* March 13, 1990 Opinion and Order, 743 F.Supp. 155 (S.D.N.

Y.1990); May 9, 1991 Memorandum & Order, 764 F.Supp. 797 (S.D.N.Y.1991); May 6, 1991 Opinion & Order, *supra*, 764 F.Supp. at 789; December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y. 1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y. 1990); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990); March 13, 1990 Opinion & Order, *supra*, 743 F.Supp. at 159–60, *aff'd* 905 F.2d 610, 622; January 17, 1990 Opinion & Order, *supra*, 728 F.Supp. at 1048–57, *aff'd* 907 F.2d 277 (2d Cir.1990); November 2, 1989 Memorandum & Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); *Joint Council 73, et al. v. Carberry, et al.*, 741 F.Supp. 491, 493 (S.D.N.Y.1990); *Local 27 v. Carberry, et al.*, July 20, 1990 at 3–4, 1990 WL 108348 (S.D.N.Y.1990).

Petitioners make the following four arguments on appeal to this Court: (1) There is no jurisdiction over the Trust; (2) carrying out the curative steps would interfere with the Trust's fiduciary duties to its participants and beneficiaries; (3) Ballew did not violate the election rules; and (4) the curative steps are improper. These arguments will be addressed in turn.

### A. Jurisdiction over the Trust and Ballew

■ The Trust and Ballew argue that since they were not parties to the underlying litigation and non-signatories to the Consent Decree, they cannot be held bound by the Election Rules. They further argue that the Trust and its employees are legally independent from the IBT. This Court and the Court of Appeals have rejected virtually identical arguments numerous times.

The Court of Appeals has repeatedly ruled that IBT affiliated local unions, joint councils and area conferences—which specifically argued that they were (i) not parties to the underlying litigation, (ii) non-signatories to the Consent Decree, and (iii) legally independent of the IBT—are subject to the Consent Decree, and the election rules promulgated pursuant to the Consent Decree. *United States v. International Brotherhood of Teamsters, supra aff'g*

July 10, 1990 Opinion & Order, *supra; United States v. International Brotherhood of Teamsters, supra*, 905 F.2d 610, *aff'g* March 13, 1990 Opinion & Order, *supra; United States v. International Brotherhood of Teamsters*, 907 F.2d 277, *aff'g* January 17, 1990 Opinion & Order, *supra; Local 27 v. Carberry, supra.*

This Court has determined that it may extend the reach of the election rules to reach entities which could jeopardize the IBT membership's right to a fair, free and honest election, pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651. This Court has ruled that Yellow Freight System, Inc., ("Yellow Freight") a company employing IBT members but not affiliated with the IBT, was subject to the election rules because they were in a position to frustrate the implementation of the Consent Decree and the election rules, lawful orders of this Court. April 3, 1991 Memorandum & Order, *slip op.*, at 4–6, 1991 WL 51065 (S.D.N.Y.1991) (*"Yellow Freight"*). An injunction was issued under the All Writs Act requiring that all Consent Decree related litigation must be before this Court. January 17, 1990 Opinion & Order, *supra*, 728 F.Supp. 1032 (S.D.N.Y.), *aff'd* 907 F.2d 277 (2d Cir.1990).

The need to assert jurisdiction over the Trust and Ballew is even more compelling than in *Yellow Freight*. The Trust is an affiliated IBT entity, and Ballew its employee. Four of its trustees are candidates for International Office and have a direct stake in the outcome of this election. The Trust administers the pension benefits of over 300,000 WCT members. Like *Yellow Freight*, the Trust and Ballew are in a position to frustrate the membership's right to a free, fair and honest election.

The Election Officer and Independent Administrator found that Ballew in his position as trustee circulated "anti-Carey campaign literature" at Trust expense. The Trust and Ballew must be subject to the election rules so they cannot use Trust personnel, resources, and status to support a particular slate of candidates. The Trust is barred by Article X, § 1.b.(1) of the election rules from making any campaign contribution to a candidate. A campaign contribution is defined by the election rules

as "any direct or indirect contribution where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate." (Election Rules, § A–1 at p. 6) *See United States v. International Brotherhood of Teamsters, supra,* 931 F.2d at 189–90 (2d Cir.1991) (holding that Election Officer must construe definition of "campaign contribution" in broad manner mandated by Consent Decree.)

The Trust and Ballew argue that they cannot be bound by the Consent Decree's election process by the Supreme Court decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989), since by that decision non-parties to a Consent Decree cannot be bound by its terms. The Second Circuit has twice held that *Martin v. Wilks* is inapplicable to this ongoing case, *United States v. International Brotherhood of Teamsters, supra; United States v. International Brotherhood of Teamsters, supra,* 905 F.2d at 622 (2d Cir. 1990), and this Court has so held in five published opinions. *See Yellow Freight, supra;* January 29, 1991 Opinion & Order, 754 F.Supp. 333, 134 F.R.D. 50 (S.D.N.Y. 1991); *Joint Council 73 v. Carberry, et al. supra;* January 17, 1990 Opinion & Order, *supra;* November 2, 1989 Memorandum & Order, *supra.*

*Martin v. Wilks* concerns the procedural fairness due entities affected by a Consent Decree. By the election rules, the Trust and Ballew have had a full and complete opportunity to argue the substance of their claims before the Election Officer, the Independent Administrator, and this Court. In addition, they have twice moved this Court for stays of the curative steps, and have filed a notice of appeal, and petitions for a stay pending appeal and mandamus to the Court of Appeals. The Trust and Ballew have had their day in Court.

### B. The Trust and Ballew's Fiduciary Duties

■ Ballew and the Trust argue that the curative steps would force them to violate their duties as fiduciaries of the Trust. Ballew and the Trust also argue that the Ballew letter was an appropriate exercise of Ballew's responsibilities under ERISA.

The status of the Trust, and the duties of Ballew as a fiduciary of the Trust are set by §§ 404–06 of ERISA, 29 U.S.C. §§ 1104–06. The fiduciary duty to provide plan comparisons is set out at § 102 of ERISA, 29 U.S.C. § 1022. Section 102 of ERISA requires trustees to furnish participants with "summary plan descriptions" upon request, and contains no statutory requirement to specifically compare one plan with another, as done by Ballew here. *Id.* Thus, the relief ordered would not hinder the Trust's duty to provide plan information.

The record established by the Election Officer and Independent Administrator demonstrate that the Ballew letter was not an appropriate response to a participant inquiry, but instead a partisan attack on the Carey campaign. It was found that there was no prior Trust practice of selectively comparing the Trust with another plan outside of collective bargaining or organizing efforts. (Dec.In.Ad. at 8–10). Rather, it was found that the timing and content of the Ballew letter were done only to respond to the Carey campaign. (Dec. In.Ad. at 8). Thus, enjoining such future action would not infringe on any fiduciary duties.

Accordingly, no part of the curative steps would prevent the Trust or Ballew from responding to appropriate inquiries by Trust beneficiaries for information as is their right under § 102 of ERISA.

### C. Violations of the Election Rules

■ Ballew and the Trust argue that the record does not support the finding of the Election Officer and Independent Administrator that Ballew's actions constituted a contribution that had a direct or indirect effect on Mr. Carey's candidacy in violation of Article X, § 1.b.(1) of the election rules. The record before this Court is to the contrary. Ballew and the Trust violated the election rules.

The Independent Administrator found that Ballew's initial solicitation of the plan comparison from Mr. Pirnke, the response of Mr. Pirnke, the content and form of the Ballew letter, the sending of the Ballew letter, and its distribution were calculated to be anti-Carey campaign material. This

finding by the Independent Administrator also considered Mr. Ballew's fiduciary duties as Trust co-chairman, the Trust's history of providing plan comparisons, and the presence of four candidates for international office as employee trustees of the Trust. The Trust and Ballew have failed to persuade this Court that the factual findings were arbitrary or capricious.

The Court finds no basis for finding that the conclusion that the Trust and Ballew violated the election rules is arbitrary and capricious. In fact, the evidence before the Independent Administrator is credible to support the finding that the Ballew letter was a contribution intended to influence the 1991 IBT election.

Further, the Independent Administrator also determined that Article XI, § 2 of the election rules gives the Election Officer authority to correct conduct:

[I]f the Election Officer determines that these rules have been violated or that any other conduct has occurred which may prevent or has prevented a fair, honest, and open election, the Election Officer may take whatever remedial action is necessary.

The Independent Administrator and Election Officer determined that the Ballew letter was anti-Carey campaign literature that would have the effect of preventing a fair, honest and open election. The finding is supported by the record.

D. The Propriety of the Curative Steps

█ The Election Officer ordered the curative steps in the context of an ongoing IBT election that will not be over until December, 1991. Well-tailored remedies for violations of the election rules should have the effect of (i) discouraging future violations of the election rules, and (ii) curing the improper taint of the conduct. The curative steps are calculated to bring these about.

The curative step that prevents the Trust and Ballew from future violations of the election rules only preclude the Trust and Ballew from violating the Consent Decree and election rules, lawful orders of the Court. The curative steps do not prevent the Trust or Ballew from carrying out any of their lawful duties.

The curative step that directs Ballew to reimburse the Trust for the cost of the plan comparison, and that he circulate a disclaimer by the Trust is reasonable step to restore the *status quo ante*.

█ The curative steps do not implicate Ballew's first amendment right to free speech. Ballew sent his letter in his official capacity as trustee of the Trust. An ERISA trustee has no right to influence an election for union office. Further, the Consent Decree bars anyone from taking any improper action which would influence the 1991 election. Additionally, the Trust and Ballew cannot establish the state action necessary for a first amendment violation. This Court has held many times for state action purposes that the Court officers act as stand-ins for the IBT General President and GEB, and not as the Government. May 9, 1991 Opinion & Order, *supra*, 764 F.Supp. 797 (S.D.N.Y.1991); *Cozza v. Lacey*, 740 F.Supp. 285 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, *supra*.

Ballew and the Trust have not demonstrated that the curative steps were arbitrary or capricious, and their objections are rejected.

*III. Conclusion*

For the reasons stated above, the opinion of the Independent Administrator is affirmed in all respects.

So Ordered.

## APPENDIX

### IN RE COMMITTEE TO ELECT RON CAREY, Complainant,

and

JOSEPH W. BALLEW, Co–Chairman and Secretary Western Conference of Teamsters Pension Fund; JACK BOOKTER, Secretary–Treasurer of IBT Local Union 278; and CHUCK MACK, Secretary–Treasurer of IBT Local Union 70, Respondents.

91–Elec.App.–106 (SA)

### DECISION OF THE INDEPENDENT ADMINISTRATOR

This matter arises out of an appeal from a March 14, 1991, decision of the Election

Officer in Case No. P–291A–LU278–CSF. A hearing was held before me by way of telephone conference on March 20, 1991, at which the following persons were heard: John J. Sullivan, on behalf of the Election Officer; Susan Davis, on behalf of the Committee to Elect Ron Carey; William Roberts, on behalf of the Western Conference of Teamsters, and Arnie Weinmeister; Duane Beeson, on behalf of Jack Bookter (Secretary–Treasurer of Local 278), and Chuck Mack (Secretary–Treasurer of Local 70); and Robert Gordon, on behalf of the Western Conference of Teamsters Pension Trust (the "Trust"), Trust Chairman Owen Bennet, Trust Co–Chairman Joseph Ballew; and Steven Tallent, another attorney on behalf of the Trust. Mr. Bookter and Mr. Mack also audited the hearing.

This matter implicates Article X of the *Rules For The IBT International Union Delegate And Officer Election* (the "Election Rules"). Article X is devoted to restrictions on campaign contributions and the use of Union funds and goods to promote the candidacy of any individual. The Trust is a pension plan covering members of IBT Local Unions affiliated with the Western Conference of Teamsters. The Trust is administered jointly by employers and employees. Mr. Ballew is the Co–Chairman and Secretary of the Trust. Mr. Ballew is not an employee of the Trust, but rather, is employed by the Western Conference of Teamsters.

The Trust has 14 employee trustees, including Mr. Ballew. In addition to Mr. Ballew, two other trustees are employees of the Western Conference. The remaining employee trustees are officers or officials of the Western Conference of Teamsters or of IBT subordinate entities affiliated with the Western Conference. Four of the employee trustees, Arnie Weinmeister, Chuck Mack, Ben Leal, and Michael J. Riley, are announced candidates for International Office aligned with the "Durham–Mathis Unity Team."

On January 23, 1990, Mr. Ballew wrote to a Mr. Richard Pirnke of Northwest Administrators, Inc., the administrators of the Trust. Upon request, Northwest Administrators will compare the benefits available under the Trust to benefits available under other pension plans or arrangements. In his January 23 letter, Mr. Ballew forwarded Mr. Pirnke a copy of the Local 804 IBT/Local 447 IAM United Parcel Employees Pension Plan covering the New York City UPS membership (the "804 Plan"). In his letter, Mr. Ballew wrote:

Since this plan will be one that our Western Conference plan will be compared to, I am sending this to you for your review and comments.

In his letter, Mr. Ballew specifically noted that:

This is the pension plan that UPS employees cite as an example of the 30–and–out concept they favor as it pays $1650/monthly with 30 years of service.

Ron Carey is President of Local Union 804 and is also an accredited candidate for IBT General President. Mr. Carey also serves as a Trustee of the 804 Plan. Mr. Carey also negotiated that Plan.

On March 19, 1990, Mr. Pirnke responded to Mr. Ballew in a three-page letter. In Mr. Pirnke's letter, he indicated:

Based on my interpretation of the information available, I do believe that on a superficial level, the East Coast [the 804 Plan] Plan will sound attractive to participants. However, as pointed out, there are several limitations which are outlined above. In comparison, the advantages of the Western Conference of Teamsters Pension Trust Fund are as follows....

The Election Officer's investigation revealed that the Trust does, from time to time, make comparisons between benefits available under the Trust with benefits available under other pension plans or arrangements. With rare exception, the comparisons prepared by the Trust contrast Trust benefits with benefits available under pension plans or arrangements which were not negotiated by the IBT. The purpose of such comparison is to assist the IBT in collective bargaining or in organizing efforts. In response to a request by the Election Officer, the Trust produced

copies of all comparisons made by the Trust for the last five years. Twenty-two of those comparisons involve non-IBT bargained plans as described above. Three comparisons, however, involved plans negotiated by the IBT or its affiliates.

Of the three analyses involving IBT negotiated plans, one does not involve a comparison with the Trust, but rather an analysis involving two plans maintained by Local Union 710. This analysis contrasts the two Local 710 plans with one another and not with the Trust.

The second IBT negotiated plan analysis performed by the Trust involved the Southern California Rock Products Plan. The analysis of the Rock Products Plan included a comparison of the benefits available under that plan with those available under the Trust. In collective bargaining with employers participating in the Rock Products Plan, representations were made by such employers that benefits under this plan were comparable to those under the Trust. The analysis revealed that the benefits under Rock Products Plan were inferior to those of the Trust and collective bargaining proposals were made by the Union to improve benefits, so such benefits would, in fact, equal Trust benefits. The Rock Products Plan was ultimately merged into the Trust.

The last comparison of Trust benefits with those available under an IBT negotiated plan involves the comparison of the 804 Plan, which is the subject of this appeal.

At the time Mr. Ballew requested the analysis from Mr. Pirnke, no request had been made to the Trust for a comparison of the 804 Plan to the Trust benefits. The Trust suggests, however, that there was much talk concerning the 804 Plan benefits, specifically the "30-and-out" provision. Notwithstanding this fact, it is clear that no one urged or suggested that Ballew request Northwest Administrators, Inc. to prepare the analysis.

When Mr. Ballew received the analysis from Mr. Pirnke, it was not generally distributed within the Trust or within the Western Conference. Moreover, the analysis of the 804 Plan was not used for collective bargaining or organizing purposes.

In November of 1990, Mr. Bookter, Secretary–Treasurer of Local 278, sent Mr. Ballew a copy of a video tape of a campaign presentation by Ron Carey. In that presentation, Mr. Carey makes reference to the Trust and discusses other pension matters, including the 30–and–out benefit found in the 804 Plan. Mr. Carey specifically urges members to make inquiries concerning the benefits available under their Plan.

On November 28, 1990, Mr. Ballew responded to Mr. Bookter. A copy of Mr. Ballew's letter is attached hereto as Exhibit A. Mr. Ballew opens his letter by stating:

> Thanks for forwarding the video tape, which I will return once our copy is obtained.
>
> Mr. Carey is an effective speaker, but with respect to pension matters, I think he takes great liberties with the facts and implies that the Local 804/UPS Pension Plan is the model of design and a reality for other pension plans to obtain.
>
> There are over 200 Teamster Pension Plans throughout the United States and Canada. I am sure that all would like to have the same scenario Mr. Carey has in pension considerations. Factors such as a single work force of some 6,000–10,000 employees with largely a single company working in an industry of high turn-over rates that typically hires young employees with significant part-time employment, are features that any pension plan would be blessed to have.

Mr. Ballew then goes on to specifically compare the 804 Plan with the Trust. This portion of Mr. Ballew's letter effectively tracks Mr. Pirnke's analysis. Copies of Mr. Ballew's November 28 letter was sent to all employee trustees of the Trust. None of the employer trustees received a copy. Copies were also sent to Arnie Weinmeister, Director of the Western Conference, and Vincent Aloise, Western Conference UPS Division Chairman.

After receiving the November 28 letter from Ballew, Bookter made copies of the

letter and distributed it to members of Local 278 who had asked him about the Carey presentation.

Chuck Mack, a member of the Western Conference Policy Committee as well as the Secretary–Treasurer of Local Union 70, distributed copies of the Ballew letter to "All Officers and Officials" of Local 70. The distribution was accompanied by a memo from Mr. Mack, on official Union stationery, stating:

> The letter compares and contrasts in some detail the Western Conference Plan and that of Local 804 in New York. In almost every aspect, the Western Conference Plan is superior. This information should prove helpful as you perform your duties.

Both Mr. Bookter's distribution and Mr. Mack's distribution of the November 28 letter were paid for by their respective Locals.

Article X, Section 1.b.(1) of the Election Rules provides that "no employer shall be permitted to contribute anything to any campaign." This prohibition is rooted in Paragraph 8 of the Consent Order which amends Article IV, Section 2 of the IBT Constitution to provide that: "No candidate for election shall accept or use any contributions or other things of value received from any employers, representative of an employer, foundation, *trust*, or similar entity." (Emphasis supplied). The Election Rules define a "campaign contribution" to include "any direct or indirect contribution where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate." It is not disputed that the Western Conference of Teamsters Pension Trust is a "Trust" as that term is used in Article X, Section 1 of the Election Rules and the Consent Order.

It is not disputed that Mr. Carey announced his intention to seek the General Presidency of the IBT sometime in the Fall of 1989, shortly before Mr. Ballew wrote to Mr. Pirnke seeking an analysis of the Local 804 Plan. It is also not disputed that as part of his campaign, Mr. Carey comments on pension issues and makes reference to the Local 804 Plan. It is also conceded that pensions and pension negotiations are among the issues being debated during the campaign for International Office in the IBT. Much of the campaign literature distributed by Carey, and by delegate candidates seeking election committed to Carey's nomination, discuss Local 804's pension plan and extol its virtues.

Given all this, it is readily apparent that Ballew's November 28 letter was designed to refute Carey's campaign statements regarding pensions and the 804 Plan. In short, the Ballew letter is intended to influence the election of Carey as General President. Stated even more plainly, the Ballew letter constitutes anti-Carey campaign literature. Given the fact that the Trust is prohibited from making any campaign contribution, its distribution of the Ballew November 28 letter violates the Election Rules.[1]

The Trust defends the actions of Mr. Ballew, suggesting that he was merely conducting the normal operations of the Trust by requesting the Pirnke analysis and by distributing that analysis to Mr. Bookter. I reject this suggestion. As already noted, the only time the Trust specifically compared an IBT-negotiated plan to its own benefits was in the context of a collective bargaining negotiation. That was not the case here. Moreover, the focus of the 804 analysis was the 30–and–out provision. The 804 Plan, however, is not the only IBT-negotiated plan with this benefit. Local 710 has a 30–and–out provision as does

---

**1.** The Election Officer recognizes that the Trust did not make a contribution to a particular "campaign." Although it is clearly suggested that the Ballew letter was written to benefit the four Trust trustees who are candidates for International Office alligned with the Durham–Mathis slate, no conclusion was drawn that the Durham–Mathis team was the recipient of the Trust's "contribution." The violation of Article X, Section 1.b.(1) of the Election Rules is not mitigated by the fact that a particular campaign was not identified as receiving the contribution. The Election Rules are designed to prohibit employer contributions either in favor of or opposed to a particular candidate.

the Central Conference of Teamsters. Neither Ballew's request to Pirnke nor his November 28 letter mentions these other plans. Instead, Ballew's request to Pirnke specifically targets the 804 Plan. In addition, his November 28 letter not only targets the 804 Plan, but specifically targets and criticizes Carey. Given this, it is clear that the Ballew letter is imbued with political overtones.

I also agree with the Election Officer's finding that Messrs. Bookter and Mack violated the Election Rules when they used Union resources to duplicate and distribute the Ballew letter. *See* Article X, Section b(3) of the Election Rules ("No union funds or goods shall be used to promote the candidacy of any individual. Use of Union equipment, stationery, facilities and personnel in connection with any campaign is prohibited....") Mr. Beeson, on behalf of Messrs. Bookter and Mack, argues that they cannot be held to have violated the Election Rules because the Election Officer failed to demonstrate that they had knowledge of the campaign implications of the Ballew letter or that they acted in bad faith in any way. In short, Beeson argues that Messrs. Bookter and Mack were simply serving their membership well by distributing information concerning trust benefits. Mr. Beeson's contentions are disingenuous. Mr. Mack has already been elected as a delegate to the 1991 IBT International Convention. In addition, Mr. Mack is a candidate for International Trustee on the Durham–Mathis slate. It is clear, given Mr. Mack's political affiliations and aspirations, that he knew or should have known of the political overtones of the Ballew letter. Moreover, the necessity of distributing information concerning a plan generated out of the New York/Metropolitan area to officers and officials of a Local in Oakland, California is suspect.

Similarly, Mr. Bookter is a candidate for delegate in his Local in San Francisco, California. The delegate election in that Local is contested and pro-Carey candidates are seeking delegate positions. Thus, Mr. Bookter, too, either knew, or should have known, that the Ballew letter carried clear political overtones. In addition, as with Mr. Mack, the necessity of Mr. Bookter distributing information about a New York pension plan to his constituency in San Francisco is suspect.

The Election Officer ordered an extensive remedy to cure these violations.

First, the Election Officer ordered the Trust, its trustees, agents and representatives, to cease and desist from any further direct or indirect contributions of anything of value including any further distribution of the Local 804 Plan comparison or the Ballew letter, where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate for delegate, alternate delegate or International Officer of the IBT.

In addition, the Election Officer directed Mr. Ballew, at his own expense, to distribute copies of the notice attached hereto as Exhibit B to all trustees of the Trust as well as to any member of the IBT to whom he sent, or caused to be sent, copies of his November 28 letter. In the Ballew notice, the following language appears:

> The Western Conference of Teamsters Pension Trust hereby disclaims the letter from Joseph W. Ballew, dated November 28, 1990, as well as the contents of that letter and affirmatively states that neither the letter nor its contents are endorsed by the Western Conference of Teamsters Pension Trust.

The Trust objects to this remedy on two grounds. First, the Trust argues that neither the Election Officer nor the Independent Administrator has jurisdiction over it, as it was not a party to the underlying Consent Decree. In *In Re: McGinnis*, 91–Elec.App.–43 (January 23, 1991), the Independent Administrator rejected a similar jurisdictional challenge by a third party, in that case, an employer (Yellow Freight Systems, Inc.). In short, the Independent Administrator concluded that enforcement of the Election Rules requires jurisdiction over third parties. The Trust attempts to distinguish *McGinnis* by arguing that the fundamental issue in that case centered on rights guaranteed by the National Labor

Relations Act, 29 U.S.C. § 158(a)(1), and the decisions of the National Labor Relations Board and federal courts interpreting that Act. Specifically, it was found that the National Labor Relations Act guaranteed non-employee IBT members limited rights to engage in campaign activity on third-party employer premises. The Trust argues that no such rights exist or are being sought to be enforced here. In making this argument, the Trust misinterprets *McGinnis*. The jurisdiction over third parties that was confirmed in *McGinnis* was rooted not in the National Labor Relations Act, but rather in the Consent Order. That jurisdiction is fully applicable here.

In addition, the Trust argues that the Election Officer cannot prevent it from performing its obligations to respond to requests for comparison of benefits. In fact, the Trust argues that it may have a legal obligation to respond to such requests. As already discussed in some detail, however, the Trust was unable to cite to any example in which it openly disparaged a plan negotiated by another IBT entity or openly criticized another official of the IBT in such a comparison. Thus, it cannot be said that the Election Officer's ruling prevents the Trust from performing any of its obligations. In fact, Susan Davis, on behalf of the Committee to Elect Ron Carey, acknowledged that the Trust could have distributed an analysis, untainted by the reference to Ron Carey or Local 804, of the comparative benefits of the Trust to the 30–and–out benefit.

As part of his remedy, the Election Officer also ordered the Western Conference of Teamsters to publish, in its publication entitled "A Report From The Western Conference Of Teamsters," an article on pension issues prepared by the Carey campaign. In addition, the Western Conference, along with Mr. Ballew were ordered to reimburse the Trust for all cost and expenses associated with the preparation and dissemination of the comparison between the Trust and the 804 Plan.

The Western Conference argues that since it was not a party to this protest proceeding, it cannot be subject to the Election Officer's remedies. In addition, the Western Conference argues that it did not participate in either the request for the Pirnke analysis or Ballew's distribution of that analysis.

It matters not that the Western Conference was not a party to this protest. Article XI, Section 2 of the Election Rules provides, in pertinent part, as follows:

> If as a result of any protest filed or any investigation undertaken by the Election Officer with or without a protest, the Election Officer determines that these Rules have been violated *or that any other conduct has occurred which may prevent or has prevented a fair, honest and open election,* the Election Officer may take whatever remedial action is appropriate.

[Emphasis supplied.]

In this case, the Election Officer has determined that conduct has occurred which may prevent or has prevented a fair, honest and open election—that is the distribution of the anti-Carey campaign literature by Ballew, Mack, and Bookter. Thus, the Election Officer is authorized to require a subordinate entity, such as the Western Conference, "to mail or otherwise distribute, at its own expense, candidate campaign materials." Election Rules, Article XI, Section 2.(h). In directing the Western Conference to publish the Carey article on pension issues, the Election Officer is merely curing the improper taint of the Ballew letter. *See, e.g., In Re: Lozanski,* 91–Elec.App.–97 (SA) (March 15, 1991). (Wherein the Independent Administrator upheld the ruling of the Election Officer ordering a Local to post a notice guaranteeing the campaign rights of its members, despite having found no merit to an allegation that the Local Shop Steward had violated the Election Rules.)

I do not, however, find it proper for the Western Conference to be held jointly and severally liable with Ballew to reimburse the Trust for all the cost and expenses associated with the preparation and dissemination of the comparison between the Trust and the 804 Plan. Although Mr.

Ballew is an administrator of the Western Conference, there is no evidence that Mr. Ballew acted in that capacity in soliciting and distributing the Pirnke analysis. The evidence suggests that Ballew acted simply as a trustee of the Trust. Thus, the Election Officer's remedy is modified to provide that Mr. Ballew shall be solely responsible to reimburse the Trust for all cost and expenses associated with the preparation and dissemination of the comparison between the Trust and the Local 804 Pension Plan.

Still further, as part of the remedy ordered by the Election Officer, both Messrs. Mack and Bookter were directed, at their own expense, to distribute copies of notices attached hereto respectively as Exhibits C and D. Messrs. Mack and Bookter object to these notices in that the notices require them, on behalf of their respective Locals, to "disclaim" the information contained in the Ballew letter. Messrs. Mack and Bookter argue that there are no facts which could support a finding that either of their Locals had at any time taken responsibility for, or otherwise made a "claim" to the Ballew letter or its contents. The fear here is that the notices may communicate to the recipients that the Locals had done something which cannot reasonably be attributed to them. In making this argument, Messrs. Mack and Bookter ignore the fact that they are both high-ranking officials in their respective Locals. In addition, Mr. Mack distributed the Ballew letter using his Local stationery. Mr. Bookter also used Union resources to distribute the letter. Messrs. Mack's and Bookter's respective Locals were clearly implicated in the distribution of the Ballew letter.

Messrs. Mack and Bookter also object to the notices in that they indicate that the Trust "shall cease and desist from any further campaign contributions or any other violations of the Election Rules." It is argued that there is no reasonable ground for requiring either Mack or Bookter to notify anyone of prescriptions applicable to the Trust. It is suggested that the effect of this provision is to communicate to the recipients that either Mr. Mack and/or Mr. Bookter were in some way involved in activities of the Trust which had been found to violate the Election Rules. While a plain reading of the notices in question does not raise such an inference, the 5th paragraph of the notices should be modified to read as follows:

The Election Officer has directed that the Western Conference of Teamsters Pension Trust shall cease and desist from any further campaign contributions or any other violations of the Election Rules.

By addition of the words "the Election Officer has directed that," it is clear that the injunction imposed on the Trust emanates from an Election Officer directive, not from either Mack or Bookter.

Except as modified herein, the ruling of the Election Officer is affirmed.

/s/ Frederick B. Lacey
Frederick B. Lacey
Independent Administrator
By: Stuart Alderoty, Designee

Date: March 22, 1991

EXHIBIT A

Western Conference of Teamsters Pension Trust

An Employer–Employee Jointly Administered Pension Plan

November 28, 1990

Mr. Jack R. Bookter

Secretary–Treasurer

Teamsters Local Union No. 278

150 Executive Park Boulevard

Suite 4500

San Francisco, CA 94134

Dear Jack:

Thanks for forwarding the videotape, which I will return once our copy is obtained.

Mr. Carey is an effective speaker, but with respect to pension matters, I think he takes great liberties with the facts and implies that the Local 804/UPS Pension Plan is the

model of design and a reality for other pension plans to obtain.

There are over 200 Teamster pension plans throughout the United States and Canada. I am sure that all would like to have the same scenario Mr. Carey has in pension considerations. Factors such as a stable work force of some six to ten thousand employees with largely a single company working in an industry with high turnover rates that typically hires young employees with significant part-time employment, are features that any pension plan would be blessed to have.

To compare the two plans, one must recognize the dedicated purpose of the respective programs. The Local 804 IBT/Local 477 IAM Plan focus is on the early retirement goal with less emphasis for the service beyond 25 or 30 years of service. While the Local 840/UPS Plan appears attractive, there are limitations of significance, such as the following:

- Although 30 (or 25)–and–out is available, there is a benefit maximum of $1,650 per month. An individual over the age of 55 cannot accrue additional benefits after 25 years of service. Any credit earned beyond that will not be recognized.
- There are also limitations on credits earned per year. To illustrate this, a credit is satisfied once a participant accrues 1600 Covered Hours in a calendar year. Once this 1600 hour limit is reached, no further hours will be taken into account. In essence, this is shorting a full-time employee almost 3 months of hours per year (2080 − 1600 = 480).
- Death and Survivor benefits are weak, protecting participants' families only at the level required by law. There are no Lump Sum Death Benefits, Survivor Child Benefits, or Survivor Spouse Benefits.

In comparison, the advantages of the Western Conference of Teamsters Pension Trust Fund are as follows:

- There are no benefit maximums under the Western Conference of Teamsters Pension Trust Fund other than the rules relating to Section 415 limitations, which do not allow pensions to exceed 100 percent of average salary over three years.
- Accrual rates are higher under the Western Conference Plan. If you assume a $2.06/hour contribution rate, a full-time employee under the Western Conference jurisdiction is earning $85.69/month every year worked for service prior to 20 years and $113.54/month every year worked for any service over 20 years.

This compares to a $66/credit accrual rate for the Local 804/UPS Plan subject to a 25 credit maximum if the participant is over the age of 55.

- In addition to the higher Western Conference accrual rates, a full-time UPS employee working under the Western Conference Plan will receive calculation credit for 40 hours a week, 52 weeks per year or 2080 hours.
- Also, the Western Conference of Teamsters Pension Trust Fund has superior Survivor Benefits. Providing for the families of deceased participants or pensioners is an important concern. Survivor benefits in the Western Conference Plan come in the form of Survivor Child, Survivor Spouse, Benefit to Spouse, and Lump Sum Death Benefits.
- Additionally, the Western Conference Plan affords portability throughout the 13 Western States where over 10,000 employers are under contract with over 125 local unions providing career opportunities with our broad jurisdictional coverage.
  - It is significant to note that the Local 804/UPS Plan does not have any reciprocity or portability to other Teamster pension plans. The Western Conference Plan offers portability throughout the West and reciprocity to *any* Teamster plan in the country.

In summary, the appeal of the Local 804/UPS Plan lies only in its ability to provide benefits prior to age 55. The early out concept has limits in benefit levels for older participants. The strengths of the Western Conference Plan lie in its ability to recognize all compensable hours for calcu-

lation purposes, which produces substantially larger benefits. In fact, even though 30–and–out is not offered under the Western Conference Plan, it bears mentioning that for a 30–year employee, he/she would have greater benefits under the Western Conference Plan once attaining age 56.

It should be emphasized that the Western Conference Plan is not indifferent to the consideration of earlier retirement availability. The trustees have examined the concept in actuarial studies by two actuarial consulting firms. The conclusions reached indicate that cost factors are significant and long service, older participants would be afforded lesser benefits to fund for the early-out concept.

The "30–and–out" concept has a magic appeal: the attraction of unreduced benefits at any age with 30 years of service. However, the "price" for just this benefit would be an additional $.28 for each $1 of contributions. Thus, *all* contribution rates for *all* participants would of necessity have to be increased by 28 percent to fund this benefit.

In a very meaningful sense, the Western Conference Plan currently provides a realistic "early out" benefit in that at the average retirement age of just under age 61, the Plan generally provides a current benefit of $2000 per month at the $1.75 contribution rate.

Jack, in conclusion, the Western Conference Plan is a financially sound pension plan. It is responsive to the needs of our membership. And while it has $10 billion in assets, it also has liabilities that virtually match these assets. These liabilities are the financial obligations to present and future retirees.

While the Western Conference Plan is not fully funded, it is well funded. Yet the need to balance assets and liabilities does limit some improvements without additional contributions to the Plan. This places the question of certain benefit improvements before the negotiating parties. At some point, this test becomes the willingness of *all* of the bargaining parties to negotiate significant contribution increases for *all* participants.

You can be assured that the trustees are committed to the process of maintaining a sound plan with improvements being a part of that commitment. Our benefits are guaranteed threefold: (1) by the Plan assets, (2) by the Prudential, and (3) by the PBGC. The Plan has increased benefits by over 65 percent in just the past five years. The process works and collectively we should be most proud of this accomplishment.

Sincerely and fraternally,

/s/ Joseph W. Ballew
    Joseph W. Ballew
    Co–Chairman/Secretary

JWB:js

bcc: Arnie Weinmeister

    Vince Aloise

### EXHIBIT B

NOTICE TO ALL RECIPIENTS OF THE LETTER FROM JOSEPH W. BALLEW, CO–CHAIRMAN AND SECRETARY WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST DATED NOVEMBER 28, 1990

The Rules for the IBT International Union Delegate and Officer Election prohibit campaign contributions by any employer, trust or similar entity. The Western Conference of Teamsters Pension Trust is a trust as defined by the Election Rules.

This prohibition includes any direct or indirect contribution where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate for delegate or International Office in the IBT.

In response to a protest filed on behalf of the Committee to Elect Ron Carey, the Election Office found that the Election Rules were violated by the preparation and dissemination, at the expense of the Western Conference of Teamsters Pension Trust, of a comparison of the benefits available under the Trust with those available under the IBT Local Union 804 pension plan.

The Western Conference of Teamsters Pension Trust hereby disclaims the letter from Joseph W. Ballew, dated November 28, 1990, as well as the contents of that letter and affirmatively states that neither the letter nor its contents are endorsed by the Western Conference of Teamsters Pension Trust.

The undersigned and the Western Conference of Teamsters Pension Trust shall cease and desist from any further campaign contributions or any other violations of the Election Rules.

Joseph W. Ballew
Co–Chairman and Secretary
Western Conference of Teamsters Pension Trust

## EXHIBIT C

**NOTICE TO ALL RECIPIENTS OF THE LETTER FROM JOSEPH W. BALLEW, CO–CHAIRMAN AND SECRETARY WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST DATED NOVEMBER 28, 1990**

The Rules for the IBT International Union Delegate and Officer Election prohibit campaign contributions by any employer, trust or similar entity. The Western Conference of Teamsters Pension Trust is a trust as defined by the Election Rules.

This prohibition includes any direct or indirect contribution where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate for delegate or International Office in the IBT.

In response to a protest filed on behalf of the Committee to Elect Ron Carey, the Election Office found that the Election Rules were violated by the preparation and dissemination, at the expense of the Western Conference of Teamsters Pension Trust, of a comparison of the benefits available under the Trust with those available under the IBT Local Union 804 pension plan.

Local Union 70 hereby disclaims the letter from Joseph W. Ballew, dated November 28, 1990, as well as the contents of that letter and affirmatively states that neither the letter nor its contents are endorsed by Local Union 70.

The Western Conference of Teamsters Pension Trust shall cease and desist from any further campaign contributions or any other violations of the Election Rules.

I will not copy or distribute any campaign literature at Local Union 70 expense and shall reimburse Local Union 70 for all expenses associated with my copying and distribution of the letter from Joseph W. Ballew, dated November 28, 1990. I will not use Local Union 70 official stationary for campaign purposes irrespective of reimbursement.

Chuck Mack
Secretary–Treasurer
IBT Local Union 70

## EXHIBIT D

**NOTICE TO ALL RECIPIENTS OF THE LETTER FROM JOSEPH W. BALLEW, CO–CHAIRMAN AND SECRETARY WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST DATED NOVEMBER 28, 1990**

The Rules for the IBT International Union Delegate and Officer Election prohibit campaign contributions by any employer, trust or similar entity. The Western Conference of Teamsters Pension Trust is a trust as defined by the Election Rules.

This prohibition includes any direct or indirect contribution where the purpose, object or foreseeable effect of that contribution is to influence the election of a candidate for delegate or International Office in the IBT.

In response to a protest filed on behalf of the Committee to Elect Ron Carey, the Election Office found that the Election Rules were violated by the preparation and dissemination, at the expense of the Western Conference of Teamsters Pension Trust, of a comparison of the benefits available under the Trust with those available under the IBT Local Union 804 pension plan.

Local Union 278 hereby disclaims the letter from Joseph W. Ballew, dated Novem-

ber 28, 1990, as well as the contents of that letter and affirmatively states that neither the letter nor its contents are endorsed by Local Union 278.

The Western Conference of Teamsters Pension Trust shall cease and desist from any further campaign contributions or any other violations of the Election Rules.

I will not copy or distribute any campaign literature at Local Union 278 expense and shall reimburse Local Union 278 for all expenses associated with my copying and distribution of the letter from Joseph W. Ballew, dated November 28, 1990.

Jack R. Bookter
Secretary–Treasurer
IBT Local Union 278